172 P.3d 335 (2007)
In the Matter of the Personal Restraint Petition of Clark Richard ELMORE, Petitioner.
No. 70233-1.
Supreme Court of Washington, En Banc.
November 21, 2007.
*339 Jeffrey Erwin Ellis, Ellis Holmes & Witchley PLLC, Seattle, WA, Meredith Martin Rountree, Owen & Rountree LLP, Austin, TX, for Petitioner/Appellant.
Michael T. Mitchell, Seattle, WA, Laura D. Hayes, Bellingham, WA, David Stuart McEachran, Bellingham, WA, for Appellee/Respondent.
MADSEN, J.
¶ 1 Petitioner Clark Elmore pleaded guilty to aggravated first-degree murder with special circumstances. The State proved the absence of sufficient mitigating circumstances justifying leniency to the satisfaction of the jury, and Judge David Nichols sentenced Elmore to death May 3, 1996. This court affirmed Elmore's conviction and sentence in State v. Elmore, 139 Wash.2d 250, 985 P.2d 289 (1999), cert. denied, 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000). Elmore has now filed this personal restraint petition, primarily focusing on claims of ineffective assistance of counsel. In addition, Elmore alleges (1) misconduct based on a juror's response during voir dire regarding his history of being a victim of sexual assault, (2) the proportionality review conducted by this court was unreliable, (3) the charging documents violated Elmore's due process rights where it was unclear which sexual offense constituted one of the aggravating circumstances, and (4) unlimited jury access to a tape recorder during deliberations denied him due process.
¶ 2 The case was remanded to the superior court for a reference hearing to determine whether counsel's failure to consult with and to present mental health experts in mitigation fell below an objective standard of reasonableness, including whether any legitimate *340 strategic or tactical reasons supported the decisions not to consult and call such experts. Elmore and the State submitted supplemental briefs following the reference hearing. Further consideration by this court was deferred pending State v. Cross, 156 Wash.2d 580, 132 P.3d 80, cert. denied ___ U.S. ___, 127 S.Ct. 559, 166 L.Ed.2d 415 (2006).
¶ 3 After full review, we now hold that Mr. Elmore has failed to establish that he is under an unlawful restraint and deny his petition for relief.

FACTS[1]
¶ 4 Clark Elmore was charged with aggravated murder in the first degree and two counts of rape in the second degree arising out of the rape and murder of his stepdaughter, Kristy Ohnstad. Elmore confessed that, en route to Kristy's school, he turned off onto a dirt road alongside Lake Samish, parked his van, and raped Kristy. After the rape, he choked her into unconsciousness and then placed his belt around her neck and tightened it. He inserted a long needle-like instrument in her ear, put a plastic bag over her head, and hit her in the head with a hammer several times causing her death. After the killing, he carried her body into the woods and covered her with plastic.
¶ 5 Elmore participated in the search for his stepdaughter. When he realized her body would soon be found, he fled to Oregon. After approximately 24 hours he returned to Bellingham and surrendered to the police. He waived his right to an attorney and spoke with authorities for approximately three hours. In his confession, Elmore admitted he thought about killing Kristy many times, whenever she brought up the fact that he had sexually molested her at an earlier age.
¶ 6 At his first appearance, Elmore stated that he did not want an attorney and attempted to plead guilty. The trial court declined the plea, set the matter over, and appointed Jon Komorowski as counsel. Mr. Komorowski, as lead counsel, promptly assembled a defense team, including cocounsel Douglas Hyldahl, investigator Michael Sparks, mental health advisor Roxanne Jarvinen, and legal assistant Susan Donato.
¶ 7 The State indicated to counsel that it was considering the death penalty. Mr. Komorowski requested, and received, a continuance of the time for filing a notice of special proceedings to prepare a mitigation report.[2] Mr. Sparks, the defense investigator, compiled a report which included information about Elmore's background, his family's destitute circumstances, and his father's alcoholism and abusive behavior. The report also detailed Elmore's decision to drop out of high school after 11th grade and join the military, his minor criminal offenses including theft and forgery, and his habit of marrying early and often. The report described Elmore as a loner who engaged in recreational drug use. It also revealed that, although Elmore rarely held a steady job, he was a capable mechanic and that he had a long-term, stable relationship with Sue Ohnstad, the victim's mother.
¶ 8 The mitigation report apparently was unpersuasive and the State elected to seek the death penalty. The State alleged two aggravating circumstances: (1) that the murder was committed to conceal a crime and (2) that the murder was committed in the course of, in furtherance of, and in immediate flight from the crime of rape. Elmore entered a plea of guilty to aggravated murder and one count of rape and the matter was set for a special sentencing proceeding.
¶ 9 In preparation for the sentencing trial, Mr. Komorowski consulted with a trial consulting firm on nearly every aspect of the case, including mitigation, jury selection, themes, and theories. The firm selected mock jurors to hear the case. After analyzing film of the mock trials, the firm found that the jurors responded well to remorse and acceptance of responsibility rather than mental health mitigation evidence. Trial *341 Court Findings of Fact (FOF) at 15 (Sept. 10, 2004 reference hearing).
¶ 10 Further investigation was conducted by the defense team between Elmore's guilty plea and his sentencing trial. The team took trips to Walla Walla to meet with Elmore and to Springfield, Oregon, where they attempted to contact people from Elmore's past and to collect records. Mr. Komorowski was aware that Elmore suffered numerous serious head injuries throughout his life, including an incident where Elmore's brother accidentally hit him on the head with an ax.[3] Additionally, the team learned that Elmore had been exposed to Agent Orange in Vietnam, that he worked with chemicals as a mechanic most of his life, that he grew up near an airport that had a history with crop-dusting, and that he was knocked unconscious at least twice in his life. FOF at 17-19.
¶ 11 The defense team did not retain mental health experts prior to advising Elmore to plead guilty. However, in preparation for the sentencing trial, counsel retained Dr. Ronald Kleinknecht, a licensed clinical psychologist in Washington State since 1971. He has served as a consultant to the Whatcom County Public Defender's Office since the early 1980s. Dr. Kleinknecht has testified in capital cases, although he had never testified in the sentencing phase of a death penalty case prior to Elmore's case. FOF at 21. Dr. Kleinknecht's postdoctoral work was primarily in neuropsychology, and he took classes in neurology. However, he did not believe his task in Elmore's case was to assess neuropsychological deficits. FOF at 22. Rather, he believed his task was to determine if Elmore suffered from a mental illness, whether he was competent to stand trial, whether he was insane, and whether he had diminished capacity. FOF at 22. Mr. Komorowski testified that he hired Dr. Kleinknecht to assist the trial team in communicating with Elmore. Mr. Komorowski wanted to know whether the communication difficulties he had experienced with Elmore stemmed from mental health deficiencies. FOF at 21-22.
¶ 12 Dr. Kleinknecht met with Elmore four times over a period of six months in 1995. He conducted a general screening to look for major mental disorders and on more than one occasion he administered the Minnesota Multiphasic Personality Inventory (MMPI). Dr. Kleinknecht was given information on Elmore's background, including work history, education, and family history of mental illness, significant hospitalizations, and clinical records. FOF at 22-23.
¶ 13 The MMPI did not reveal signs of a major mental disorder, schizophrenia, or psychotic-like disorders. According to Dr. Kleinknecht, if there were clinically significant brain damage, he would have expected it to manifest through difficulty in abstract thinking, poor memory, inability to use higher mental processes, and inability to hold objects. He found Elmore a reasonably good historian and found it significant that Elmore had been an automobile mechanic, which requires the ability to hold different parts in the mind at the same time and envision them operating together. FOF at 23-24. Dr. Kleinknecht did not observe any serious impairment in Elmore's cognitive skills, although he did not conduct specific tests. FOF at 24.
¶ 14 Dr. Kleinknecht was not given information about Elmore's lifelong exposure to neurotoxins or his series of head injuries. FOF at 23. According to Dr. Kleinknecht, if he had been given this information, he would have likely referred Elmore for neurotoxic testing. Neuropsychological testing is an accepted method for evaluating whether a person has functional neuropsychological deficits. Dr. Kleinknecht testified that meeting and talking to a person is not a perfect assessment tool for determining brain dysfunction. FOF at 25.
¶ 15 Dr. Kleinknecht referred the trial team to Dr. Ronald Roesch to follow up on his finding of antisocial personality disorder revealed in the MMPI results and to examine Elmore for possible psychopathy. FOF at 25. Dr. Ronald Roesch is a licensed clinical psychologist, a professor of psychology, and *342 the director of the Mental Health Law and Policy Institute at Simon Frasier University. FOF at 25-26. Mr. Komorowski testified that he hired Dr. Roesch because of his background in forensics and in evaluating psychopathy and future dangerousness. Mr. Komorowski also testified that he hired Dr. Roesch to assist him in communicating with Elmore. FOF at 27. Dr. Roesch testified that he believed his task was to determine whether Elmore met the criteria for psychopathy and to assess the related issue of Elmore's risk for violence in and out of prison. FOF at 27.
¶ 16 Dr. Roesch was given background information about Elmore as well as other documents helpful in assessing risk. Dr. Roesch subsequently interviewed Elmore for four hours. FOF at 27. This interview was structured around the psychopathy checklist. Dr. Roesch reviewed Dr. Kleinknecht's MMPI results to confirm his impression that Elmore lacked any serious indications of mental disorder. FOF at 28. Based on his evaluation of Elmore's remorse and empathy, Dr. Roesch concluded Elmore was not a psychopath. FOF 29.
¶ 17 In his reports, Dr. Roesch characterized the crime as an impulsive, reactive, and a poorly considered attempt to cover up the rape. In Dr. Roesch's opinion, the crime demonstrated overkill, which is consistent with heightened emotional arousal. FOF at 31.
¶ 18 Dr. Roesch's report also indicated that Elmore admitted to a history of deviant sexual arousal, especially towards prepubertal girls. Elmore had acted on those feelings on two occasions. FOF at 28. Mr. Komorowski was gravely concerned about Dr. Roesch's report since it referred to Elmore's history of deviant sexual arousal. Mr. Komorowski was also concerned about Dr. Roesch's finding that after Elmore raped Kristy, he appreciated the seriousness of his act. According to the medical report, Elmore believed his life was over, so he decided to kill Kristy before she regained consciousness. This concerned Mr. Komorowski because it suggested premeditation. He believed this finding would result in a "battle of the experts" about what happened immediately before, during, and after the crime occurred. FOF at 29-30.
¶ 19 Dr. Roesch testified that his evaluation failed to reveal any evidence of organic brain damage, although that was not the focus of his evaluation. Dr. Roesch is not a neurologist, he was not asked to determine whether Elmore suffered from neuropsychological deficits, and he did not perform neuropsychological testing. Dr. Roesch was not given information about Elmore's exposure to neurotoxins, neurological insults, neuropsychological data, or his fraternal twin brother's seizure disorder. If he had been given this information, Dr. Roesch testified that he would have recommended a neuropsychological evaluation. FOF at 30-31.
¶ 20 Dr. Roesch testified he recommended that the defense team contact David Caloff, an expert in posttraumatic stress disorder, which it did. Although Mr. Caloff was not a psychologist, he advise the trial team that Mr. Komorowski reminded Mr. Elmore of his father, which created problems in communications with Elmore. Thereafter, Mr. Komorowski directed other members of the trial team to meet with Elmore in his place, when possible. FOF at 32.
¶ 21 Additionally, the defense team consulted with two experienced death penalty attorneys. Todd Maybrown testified that Mr. Komorowski contacted him to discuss his plan to present a psychologist as a mitigation witness. Mr. Maybrown suggested that Mr. Komorowski expand mitigation evidence to include neuropsychology. The defense team also consulted Bob Mahler, an experienced consultant in capital cases. He advised Mr. Komorowski that a mental defense can be consistent with a remorse defense. FOF at 16-17.
¶ 22 The defense investigator testified that Elmore desperately wanted to have the case resolved to bring closure for the victim's mother. Elmore was also very concerned about public attention on his case because of the effect it would have on his family, particularly his mother. Pers. Restraint Pet. & Br. in Supp., attach. 10 (Decl. of Michael Sparks). He told Mr. Komorowski not to present evidence of his background and not *343 to call his family members as witnesses. FOF at 36. He also objected to presentation of mitigation evidence, threatening to act out in the courtroom if his wishes were not followed. FOF at 36.
¶ 23 Ultimately, the defense team decided not to present mental health evidence as mitigation. Instead, their strategy was to focus on remorse and Elmore's acceptance of personal responsibility for the crime. Elmore agreed to appear in jail garb throughout the sentencing phase to show that he accepted responsibility for the crime. On the first day of jury selection Elmore also appeared in shackles. After the prosecutor raised concerns about Elmore appearing before the jury in shackles, counsel affirmatively agreed that his client would remain shackled that day. Elmore did not appear in shackles after the first day.
¶ 24 At the sentencing hearing the State relied primarily on Elmore's confession. The State called Detective Gitts who testified about Kristy's disappearance and presented a tape-recorded version of Elmore's confession. The medical examiner testified to the cause of death and the State offered the testimony of police officers who had contact with Elmore during his surrender.
¶ 25 Elmore called five witnesses. Three were Snohomish County judges who testified to Elmore's desire to plead guilty and to his dejected demeanor. The fourth witness was Mr. Sparks, the defense investigator. Sparks presented biographical testimony and a pictorial of Elmore's life. The final witness was Professor David Boerner who testified regarding the effect of Elmore's prior felonies under the "three strikes" law. The defense case took approximately one hour.
¶ 26 The jury found that there were not sufficient mitigating circumstances to merit leniency and the court imposed the sentence of death. This court affirmed the conviction and sentence on direct appeal.
¶ 27 In preparation for bringing this personal restraint petition, defense counsel were granted funds to retain an investigator and defense medical experts. A petition was filed on June 29, 2001, alleging as grounds for relief ineffective assistance of counsel, juror misconduct, denial of the right to a reliable proportionality review, a violation of due process based on the jury's unlimited access to Elmore's taped confession, and the State's failure to give notice as to which sexual offense it was relying on to form the basis of one of the alleged aggravating circumstances.
¶ 28 Based on these alleged defects, Elmore petitioned this court to vacate his conviction and death sentence. Alternatively, he requested a remand to Whatcom County Superior Court for a hearing regarding the effectiveness of trial counsel. As noted above, this court remanded the case for a reference hearing.

ANALYSIS
¶ 29 Both constitutional and non-constitutional errors may be raised in a collateral challenge. In re Pers. Restraint of Davis, 152 Wash.2d 647, 671, 101 P.3d 1 (2004). A petitioner has the burden of showing actual prejudice as to claimed constitutional error; for alleged nonconstitutional error, he must show a fundamental defect resulting in a complete miscarriage of justice. In re Pers. Restraint of Rice, 118 Wash.2d 876, 884, 828 P.2d 1086 (1992); In re Pers. Restraint of Cook, 114 Wash.2d 802, 813, 792 P.2d 506 (1990). As mentioned above, the bulk of Elmore's complaints involve counsels' performance. Elmore claims he was denied effective assistance of counsel, guaranteed by the Sixth and Fourteenth Amendments, at nearly every turn.
¶ 30 The constitutional standard for a violation of the right to counsel is set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A petitioner must show that defense counsel's conduct was deficient, i.e., that counsel's performance fell below an objective standard of reasonableness. State v. Reichenbach, 153 Wash.2d 126, 130, 101 P.3d 80 (2004) (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052), and that there is a reasonable probability that, but for the deficient conduct, the outcome of the proceeding would have been different. Id. To establish a constitutional violation, a petitioner must show that counsel's deficiency was "so serious as to deprive *344 the defendant of a fair trial." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. There is a strong presumption that counsel's decision constituted sound trial strategy. Rice, 118 Wash.2d at 889, 828 P.2d 1086.

Ineffective Assistance of Counsel Guilt Phase
¶ 31 Elmore first claims that counsel's performance in the guilt phase fell short of the accepted standard of reasonableness for counsel in a capital case. He says that his attorneys failed to conduct a competent investigation into his mental deficiencies prior to advising him to plead guilty, failed to negotiate with the prosecutor regarding the death penalty, and wrongly advised him to plead guilty.
1. Failure to Conduct a Competent Investigation into Petitioner's Mental Deficiencies Before Entering a Guilty Plea.
¶ 32 Under Strickland, counsel has a duty to conduct a reasonable investigation under prevailing professional norms. Strickland, 466 U.S. at 691, 104 S.Ct. 2052. The defendant alleging ineffective assistance of counsel "`must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" In re Pers. Restraint of Hutchinson, 147 Wash.2d 197, 206, 53 P.3d 17 (2002) (quoting State v. McFarland, 127 Wash.2d 322, 336, 899 P.2d 1251 (1995)). In any ineffectiveness claim, a particular decision not to investigate must be directly assessed for reasonableness, giving great deference to counsel's judgments. Strickland, 466 U.S. at 691, 104 S.Ct. 2052. Inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions. Id.
¶ 33 In Davis, this court has clearly explained the standard for reasonable investigation by defense counsel:
Defense counsel must, "`at a minimum, conduct a reasonable investigation enabling [counsel] to make informed decisions about how best to represent [the] client.'" This includes investigating all reasonable lines of defense, especially "the defendant's `most important defense.'" Counsel's "failure to consider alternate defenses constitutes deficient performance when the attorney `neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.'" Once counsel reasonably selects a defense, however, "it is not deficient performance to fail to pursue alternative defenses." An attorney's action or inaction must be examined according to what was known and reasonable at the time the attorney made his choices and "`ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case.'"
Davis, 152 Wash.2d at 721-22, 101 P.3d 1 (alterations in original) (footnotes and citations omitted).
¶ 34 Elmore argues that counsel's failure to have him evaluated by mental health experts prior to the guilty plea fell below the objective standard of reasonableness under prevailing professional norms as part of the duty to investigate. We disagree. First, this is not a case where counsel failed to perform any investigation. Mr. Komorowski's team did an in-depth investigation in preparation of a mitigation report that it submitted to the prosecutor's office before the decision to seek the death penalty was made. While the report did not include the opinions of experts, it did chronicle the petitioner's medical history and the abuse suffered by petitioner. Further, there is no indication that Elmore was incompetent, insane at the time of the commission of the crime, or under the influence of any condition that would have diminished his capacity to form the requisite intent to commit the crimes charged.
¶ 35 It is also significant that, from the time he surrendered to authorities, Elmore was determined to take responsibility for his actions and plead guilty. At his first appearance Elmore attempted to enter pleas of guilty without assistance of counsel. The record suggests that he never wavered in his desire to plead guilty. Mr. Elmore gave a 74-page confession describing, as Mr. Komorowki noted, a "logical and goal-oriented action that resulted in the death of his girl-friend's daughter" and included the fact that *345 he had thought about killing Kristy many times before. FOF at 33.
¶ 36 Based on the overwhelming evidence of guilt and the absence of legal defenses, counsel's strategy was to rely on Elmore's remorse and willingness to take responsibility, a strategy that counsel reasonably could have concluded would have been undermined by an attempt to diminish Elmore's culpability through presentation of mental health experts. Weighed against these considerations, counsel's failure to investigate Elmore's mental health prior to advising him to plead guilty did not fall below the reasonableness standard of Strickland.
2. Failure to Negotiate a Plea Bargain with the Prosecutor.
¶ 37 The Supreme Court has held that the Strickland standard is applicable in the plea process. Hill v. Lockhart, 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). A criminal defendant is entitled to effective counsel in plea negotiations. State v. Swindell, 93 Wash.2d 192, 198, 607 P.2d 852 (1980). In satisfying the Strickland test, as applied to the plea process, a defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. In re Pers. Restraint of Riley, 122 Wash.2d 772, 780-81, 863 P.2d 554 (1993) (citing Lockhart, 474 U.S. at 57-59, 106 S.Ct. 366). A bare allegation that a petitioner would not have pleaded guilty if he had known all of the consequences of the plea is not sufficient to establish prejudice under the Strickland test. Riley, 122 Wash.2d at 782, 863 P.2d 554.
¶ 38 Mr. Komorowski testified that he could not recall plea bargaining for a life sentence in exchange for a guilty plea. Moreover, he did not think about plea bargaining for fewer aggravators in anticipation of a proportionality review in the event of a death sentence. This court considers the number of aggravators in assessing proportionality of a death sentence. Elmore, 139 Wash.2d at 309, 985 P.2d 289; State v. Stenson, 132 Wash.2d 668, 759, 940 P.2d 1239 (1997).
¶ 39 As noted earlier, Elmore's defense team submitted a very detailed and well prepared mitigation statement. Such a statement is specifically intended to dissuade the prosecutor from seeking the death penalty. Additionally, the State submitted an affidavit from the county prosecutor, David McEachran, stating that he informed counsel that he would not consider plea bargaining with the death penalty. Although there is no specific mention of a plea discussion regarding the number of aggravating circumstances, Mr. McEachran's affidavit strongly suggests that he would not have negotiated on this point either.
¶ 40 While Mr. Komoroski's failure to initiate negotiations on the number of aggravating factors may not have been a strategic decision, on this record Elmore fails to carry his burden of establishing that, but for counsel's failure to negotiate on this point, there is a reasonable probability that the prosecutor would have agreed to a reduction in the number of aggravators or that he would not have pleaded guilty and insisted on going to trial.
3. Advice to Plead Guilty.
¶ 41 Elmore also claims that counsel's advice to plead guilty fell below the accepted standard for counsel in a death penalty case. Based on the experts' affidavits, he argues that there was no advantage to him in pleading guilty and that his attorney was advised to proceed to trial but unreasonably ignored that advice. For example, Elmore's affidavit from Dennis Balske states that, by conducting a trial on guilt, the jury can begin to discharge its emotional reactions to the crime and begin concentrating on the defendant as a human being. Balske also stated that Elmore's attorneys missed the opportunity to begin presenting the mitigation case to the jury by introducing mental health evidence and social history during the guilt phase. Pers. Restraint Pet. & Br. in Supp., attach. 1 (Decl. of Dennis Balske). Elmore also submitted his own affidavit that he would not have pleaded guilty if counsel had advised him that his plea might have an adverse impact on the penalty determination.
*346 ¶ 42 As the record demonstrates, Elmore attempted to plead guilty at his first appearance. At all times thereafter he expressed a desire to spare his family from the publicity associated with a trial and a desire to take responsibility for his actions. Mr. Komorowski testified that his strategy was built around the dual themes of remorse and taking responsibility. He did not want to do anything to detract from that strategy. As mentioned, Elmore gave a full, detailed confession and Mr. Komowski testified that he did not want the focus to be on the circumstances of the crime. Considering there was no viable defense to the charges, his defense theme, and his client's desire to plead guilty, we conclude that Mr. Komorowski's advice to plead guilty was based upon reasonable trial strategy.

Ineffective Assistance of Counsel Penalty Phase
1. Failure to Present Evidence of Mental Deficiencies During Sentencing Trial.
¶ 43 RCW 10.95.070 provides statutory mitigating factors that a jury may consider in imposing the death penalty. For purposes of this argument, Elmore argues the particular significance of two factors:
(2) Whether the murder was committed while the defendant was under the influence of extreme mental disturbance;
. . . .
(6) Whether, at the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired as a result of mental disease of defect.
RCW 10.95.070.
¶ 44 He claims that he was denied effective assistance of counsel because his trial attorneys, through inexperience, failed to investigate and present evidence regarding these statutory mitigating circumstances.[4] Specifically, Elmore argues that there was ample, compelling evidence that he was under the influence of extreme mental disturbance and was unable to conform his conduct to the requirements of the law because of child sexual and physical abuse, adult sexual trauma, and neuropsychological impairment.
¶ 45 Whether to present mitigating evidence is a strategic decision. State v. Woods, 143 Wash.2d 561, 609, 23 P.3d 1046 (2001). Mitigating evidence includes any relevant factors that do not constitute a legal excuse for the offense but which, in fairness and mercy, may justify a less severe punishment. State v. Pirtle, 127 Wash.2d 628, 671, 904 P.2d 245 (1995); In re Pers. Restraint of Rupe, 115 Wash.2d 379, 397, 798 P.2d 780 (1990). There is a strong presumption that trial counsel's performance was adequate, and exceptional deference must be given when evaluating counsel's strategic decisions. Strickland, 466 U.S. at 689, 104 S.Ct. 2052.
¶ 46 With regard to Mr. Komorowski's testimony during the reference hearing, the trial court made the following findings of fact:
¶ 47 Mr. Komorowski wanted to focus on petitioner's remorse and personal responsibility. FOF at 33. He was concerned that the State would examine petitioner if a mental health defense was raised, and that petitioner would make damaging statements to a State mental health expert. The defense team made a strategic determination that a mental health defense would be detrimental. FOF at 34. Mr. Komorowski was also concerned that petitioner had made a damaging statement to Dr. Kleinknecht about his sexually deviant feelings.
¶ 48 As the case progressed, petitioner began to verbalize a lack of remorse, which was troubling to the defense team. This happened after the victim's mother wrote petitioner a letter stating that she felt her relationship with petitioner would never be the same. Petitioner no longer felt that he had anyone to apologize to for his crime. FOF 34-35. If the State realized that petitioner *347 was no longer remorseful, the defense team was concerned that the State would play a videotape of petitioner asking the media for help finding Kristy's body. FOF at 36.
¶ 49 Mr. Komorowski testified that petitioner objected to the presentation of a mitigation case, and threatened to act out in the courtroom if mitigation was put on for the jury. Petitioner did not want any family members called as witnesses or aspect of his life put on as evidence. Mr. Komorowski had to basically deceive petitioner to get his mother and sister into the courtroom. FOF at 36.
¶ 50 There is no question that the defense team did investigate petitioner's mental health deficiencies. Rather, the issue is whether counsel's failure to conduct further evaluations amounted to deficient representation. We believe it did not. The defense team made a strategic decision to not present mental health mitigation evidence. The potential for damaging rebuttal evidence was almost certain after Elmore admitted his deviant sexual feelings toward young girls. The failure to present mitigating evidence is reasonable where the evidence may have opened the door to damaging rebuttal evidence. In re Pers. Restraint of Stenson, 142 Wash.2d 710, 744, 16 P.3d 1 (2001) (citing Kwan Fai Mak v. Blodgett, 970 F.2d 614, 618 (9th Cir.1992)).[5]
¶ 51 Further, as the defense team predicted, there was a battle of the experts during the reference hearing. The expert witnesses did not agree on whether, or to what extent, Elmore's mental deficiencies affected his ability to conform to lawful behavior. In the absence of clear mental health evidence, there was a risk that such evidence would have detracted from counsel's strategy to show Elmore's remorse and willingness to accept responsibility, in addition to inviting damaging rebuttal. Accordingly, Elmore has not shown that counsel's decision not to present mental health mitigation evidence fell below accepted professional norms.
2. Failure to Object to Elmore Appearing Before the Jury in Shackles.
¶ 52 Elmore claims that his counsel should have objected to the jury being allowed to observe him in shackles because it suggested strongly that he is dangerous even in a jail setting. In State v. Finch, 137 Wash.2d 792, 864-66, 975 P.2d 967 (1999), this court stated that shackling a defendant during the penalty phase of a capital murder case may have an affect on the jury's determination of future dangerousness and reversed the defendant's death sentence. Id. at 866, 975 P.2d 967. In that case, the defendant's objection to the shackles had been overruled by the trial court. Id. at 804, 975 P.2d 967. This court held that the fact that the defendant had not only been shackled but also been handcuffed to his chair and leg-cuffed to the table during the testimony of two of the intended victims precluded a finding that the shackling was harmless. Id. at 866, 975 P.2d 967.
¶ 53 This case is significantly different from Finch. Elmore appeared before the jury in shackles only on the first day of jury selection. Elmore, 139 Wash.2d at 274, 985 P.2d 289. Further, he deliberately appeared in jail garb as part of his strategy of acknowledging responsibility. Id. Although counsel was surprised by the shackles, he *348 agreed to leave them on that day. Id. Elmore did not appear shackled again throughout the remaining days of the penalty proceeding. Id. On direct appeal, this court held that Elmore had failed to establish prejudice and affirmed the death sentence. Id.
¶ 54 Elmore argues that his attorneys provided ineffective assistance of counsel by failing to object to his shackling and has submitted affidavits in support of his position, averring that, had he been asked whether he wanted to appear in shackles, he would have declined because they were uncomfortable. Further, he argues that Mr. Komorowski did not consider the impact of shackles on the jury regarding future dangerousness. And, an affidavit by Mr. Balske states that there is no scenario where reasonably competent counsel should allow a defendant to appear shackled before the jury.
¶ 55 In Davis, this court granted a new sentencing hearing where the defendant was shackled during the guilt and penalty phase of his trial, even though the opportunity for jurors to observe him in shackles was "partial and fleeting." Davis, 152 Wash.2d at 705, 101 P.3d 1. In that case we distinguished Elmore, noting that "[d]espite the admonition to trial courts to weigh on the record the reasons for restraining an accused in the courtroom," defense counsel are not relieved "`of the obligation to object [to] shackling.'" Id. at 699, 101 P.3d 1 (quoting Elmore, 139 Wash.2d at 273, 985 P.2d 289 (emphasis omitted)).
¶ 56 As noted, counsel's strategy was to convince the jury that Elmore took full responsibility for his actions and that he was willing to face the consequences. Allowing Elmore to appear in prison garb was intended to convey this theme to the jury. Similarly, shackles might also demonstrate a defendant's willingness to take responsibility and to be punished for his crimes. However, shackles may also convey that the defendant is dangerous, even in a courtroom. Finch, 137 Wash.2d at 865, 975 P.2d 967. Thus, we have required a balancing of certain interests before a prisoner may appear in shackles before a jury. Id. at 848, 975 P.2d 967. We agree with Elmore that counsel's failure to object to his client appearing before the jury in shackles fell below an objective reasonableness standard for counsel in a capital case.
¶ 57 Nevertheless, as we noted in Finch, a shackling error may be harmless. Id. at 862, 975 P.2d 967. Because this issue is raised in the context of a right to counsel challenge, Elmore must show that there was a reasonable probability that, but for the deficient conduct, the outcome of the proceeding would have been different. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. In Finch, the defendant never appeared before the jury without being physically restrained. Additionally, the defendant's leg restraints were handcuffed to the leg of the table and his right arm was handcuffed to his chair during the testimony of two of the victims. In contrast, Elmore was shackled only on the first day of the sentencing trial. And, unlike the defendant in Finch, Elmore's trial strategy was to demonstrate remorse and to accept responsibility. This evidence was sufficient to off-set any implication of dangerousness created by Elmore's appearance in shackles. Viewing the evidence as a whole, we do not believe that Elmore has carried his burden of demonstrating that, but for his brief appearance in shackles, the jury would have made a different decision.
3. Failure to Present Evidence of Lack of Future Dangerousness.
¶ 58 Elmore claims that his counsel was ineffective because he failed to investigate and present evidence regarding his ability to adjust appropriately to prison life and present no future danger to others. The issue of future dangerousness is encompassed by two statutory mitigating factors:
(1) Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity;
. . . .
(8) Whether there is a likelihood that the defendant will pose a danger to others in the future.
RCW 10.95.070.
¶ 59 Elmore offered several affidavits in regard to this claim. First, he offered Mr. *349 Komorowski's affidavit that he did not have any prison expert review Elmore's prior prison records to assess Elmore's potential for future dangerousness and argued only in closing that the State had failed to meet its burden of proving future dangerousness. Elmore also submitted an affidavit from Dr. Woods, asserting that Elmore's history shows that he functions successfully in structured environments and that he would not likely present any danger in the prison system. Additionally, he offered an affidavit from Mr. Unger, averring that Unger knew Elmore for about eight years before the crime and always found him to be a pleasant and honest person and that Elmore was gentle and caring with his daughter, Kayla. Mr. Unger speculated that Elmore would not present a jail management problem. In another affidavit, Mr. Sellars, who performed jail ministry for the Hillcrest Chapel church, averred that Elmore was extremely concerned with his wife and daughter's welfare. He also opined that Elmore was docile and could live successfully within the structures of the prison environment. Finally, Elmore submitted an affidavit from Mr. Chase Riveland, the former secretary of the Washington State Department of Corrections, stating that he reviewed Elmore's incarceration history and that Elmore demonstrated good adjustment to prison.
¶ 60 In opposition, the State offered Elmore's prison record, which contains numerous examples of instances where Elmore's conduct resulted in major violations with disciplinary repercussions. In one instance, Elmore was caught concealing a saw blade under his shirt, and in another, he was disciplined after using a drill to make a hole in the sole of his shoes. Additionally, the State points out that Elmore has a record of escape in Idaho and Washington as well as several parole violations.
¶ 61 While the failure to introduce any mitigation evidence may support a claim of ineffective assistance of counsel, such a decision is reasonable where evidence may open the door to damaging rebuttal evidence. Stenson, 142 Wash.2d at 744, 16 P.3d 1 (citing Mak, 970 F.2d at 618); Strickland, 466 U.S. at 700, 104 S.Ct. 2052 (no prejudice where proffered evidence would have opened the door to harmful and conflicting evidence). Here, the defense team had Elmore's prison record and criminal history and cited it extensively in the mitigation report submitted to the prosecutor. Yet, counsel made a tactical decision not to present the evidence to the jury in mitigation. While the wisdom of counsel's decision may be debatable, under the Strickland standard we cannot say that the decision fell below the objectively reasonable standard in light of Elmore's history of escape and prison disciplinary problems. Accordingly, we reject his claim of ineffective assistance of counsel for failing to present mitigation evidence regarding future dangerousness.
4. Failure to Call Witnesses to Testify to Elmore's Remorse and Failure to Present Elmore as a Human Being to the Jury.
¶ 62 As noted above, whether or not to present mitigating evidence is a strategic decision. Woods, 143 Wash.2d at 609, 23 P.3d 1046. Although it is not a statutory mitigating factor, remorse is a relevant factor in determining penalty. See State v. Burkins, 94 Wash.App. 677, 698, 973 P.2d 15 (1999); State v. Ross, 71 Wash.App. 556, 563, 861 P.2d 473, 883 P.2d 329 (1993) (defendant's lack of remorse may be an aggravating factor to justify exceptional upward sentence).
¶ 63 Remorse was a central theme of Elmore's defense to the death penalty. As mentioned above, Mr. Komoroski called five witnesses during the penalty phase. Three judges testified to Elmore's remorse and willingness to accept responsibility. Mr. Sparks, his investigator, also testified regarding Elmore's remorse as well as his personal history.
¶ 64 Elmore claims that several people, known to the defense, could have given dramatic and persuasive testimony about his extreme level of remorse. Counsel's failure to call these witnesses, Elmore claims, was not a strategic decision and fell below the accepted standard for counsel in a death penalty case. He claims that he was prejudiced by counsel's conduct. He submitted *350 several affidavits in support of his claim. Dana Paul Sellars, who performed jail ministry for the Hillcrest Chapel church, averred that as a part of his ministry he visited Elmore in jail. He observed Elmore's extreme remorse on several occasions. Sellars also says that Elmore was extremely concerned with his wife's and daughter's welfare. An affidavit from Donald Pierce, a corrections officer for the Whatcom County jail, states that Elmore was an "emotional wreck" and that he appeared extremely remorseful. Mr. Terry Unger averred that he knew Elmore for about eight years before the crime and always found him to be a pleasant and honest person. His affidavit states that he has observed Elmore with his daughter, Kayla, and that Elmore was gentle and caring with her. Mr. Unger stated that he visited Elmore in jail and that he was overcome with remorse. Mr. Unger says he spoke with the elected prosecutor, Mr. McEachran, and told him that Elmore needed psychological help because he could not understand why he had murdered Kristy. Finally, Mr. Balske, petitioner's attorney expert, claimed in his affidavit that counsel's performance was deficient because he had several reputable witnesses from the community who should have been called to testify to petitioner's extreme remorse.[6]
¶ 65 In Mak, 970 F.2d at 619, the Ninth Circuit held that the failure of defense counsel to present any humanizing evidence from members of the defendant's family or community fell below the objective standard of reasonableness under prevailing professional norms. In a more recent case from the Ninth Circuit, Babbitt v. Calderon, 151 F.3d 1170 (9th Cir.1998), the court held that counsel's failure to present evidence of his tortured family history, his good deeds as a child, his learning disability, and his service in Vietnam did not fall below the accepted standard of attorney practice. There the defense attorney hired an experienced investigator who thoroughly investigated defendant's background. Additionally, counsel called family members and other witnesses to testify to the defendant's good character. In other words, counsel had presented humanizing evidence. Id. at 1176. The court also held that there was no prejudice from the decision not to present the additional evidence urged by the defendant because it would have been cumulative. Id.
¶ 66 This case is more similar to Babbitt than Mak. Mr. Sparks, an experienced investigator, extensively investigated Elmore's history. With his assistance, Mr. Komorowski prepared an in-depth mitigation report that was presented to the jury through Mr. Sparks. Additionally, counsel called three judges to testify to Elmore's remorseful and dejected appearance shortly after his surrender. As with Babbitt, additional witnesses would have been cumulative.
¶ 67 Moreover, at the reference hearing Mr. Komoroski testified that "[a]s the case progressed Mr. Elmore began to verbalize things that were very troubling to the defense team and indicated to them that they were backing off the remorse aspect." FOF at 34. After learning that his girlfriend no longer had feelings for him, Mr. Elmore indicated that he had no one to apologize to for his crimes against Kristy. FOF at 35. Mr. Komoroski was concerned that if the State learned that Elmore no longer felt remorse, the State would "start interviewing jailers, transportation officers and even the jail chaplain, who were aware of Mr. Elmore's feelings." FOF at 36. As noted, the failure to present mitigating evidence is reasonable where the evidence may have opened the door to damaging rebuttal evidence. Stenson, 142 Wash.2d at 744, 16 P.3d 1 (citing Mak, 970 F.2d at 618).
¶ 68 Counsel conducted a full investigation and was aware of the witnesses available. He was also aware of the possibility that these witnesses might trigger rebuttal witnesses who would damage the defense strategy. Based on this evidence, we believe that counsel's decision as to which witnesses to call was a tactical one.

Juror Misconduct
¶ 69 Elmore claims that he was denied his state and federal constitutional *351 rights to an impartial jury where a juror "affirmatively and repeatedly misled court and counsel" regarding a matter bearing directly upon his impartiality. Pers. Restraint Pet. & Br. in Supp. at 154. This claim is without merit. Question 86 on the juror questionnaire form asked "Have you, or any of your friends or relatives, been the victim of a crime (reported or unreported)"? Question 90 on the juror questionnaire form asked "Have you, or any of your friends or relatives, been the victim of a sexual offense?" Juror 12 checked the "no" box in response to both questions. Later, following the verdict, defense investigators interviewed Juror 12. Pers. Restraint Pet. & Br. in Supp., attach. 39 (Decl. of Margaret Hoban). During that interview, Juror 12 mentioned that he had been sexually molested as a child.[7] The first incident occurred when Juror 12 was "spooned" by another boy who was a few years older. The older boy's penis was touching Juror 12's buttocks for only a few moments. Dep. of Juror 12, ll. 0020.22 to 0021.1. The second incident was a couple of years later, when a fellow Boy Scout who was a few years older touched his penis as he slept. When Juror 12 shifted in bed, the older boy removed his hand. Id. at ll. 0016.1 to 0019.20.
¶ 70 In Juror 12's deposition, submitted as an attachment to the petition, the juror stated that he did not give correct answers because he did not recall the incidents until Elmore's investigator questioned him. Moreover, he stated that when he answered questions 86 and 90 on the juror form he did not think about those incidents. Id. at ll. 0040.15 to 0041.17. He also testified that his answers to the questions were correct, based on his belief that neither incident constituted an illegal action. Id. at ll. 0041.5 to 0041.8. "[E]ven on today's standards I do not consider that as being actual sexsexual abuse except based on today's definition of it. To me I would just call that more experimentation between a bunch of young kids." Id. at ll. 0046.5 to 0046.9.
¶ 71 It is well settled that a litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials. Brown v. United States, 411 U.S. 223, 231-32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). "One touchstone of a fair trial is an impartial trier of fact`a jury capable and willing to decide the case solely on the evidence before it.'" McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (quoting Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). "A strong, affirmative showing of misconduct is necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury." State v. Balisok, 123 Wash.2d 114, 117-18, 866 P.2d 631 (1994).
¶ 72 In order to receive a new trial, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire and then further show that a correct response would have provided a valid basis for a challenge for cause. McDonough Power Equip., 464 U.S. at 556, 104 S.Ct. 845. "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." Id.; In re Pers. Restraint of Lord, 123 Wash.2d 296, 313, 868 P.2d 835 (1994) (any misleading or false answers during voir dire require reversal only if accurate answers would have provided grounds for a challenge for cause); In re Det. of Broten, 130 Wash.App. 326, 336, 122 P.3d 942 (2005), review denied, 158 Wash.2d 1010, 143 P.3d 830 (2006) (noting that Washington cases are in accord with test in McDonough).
¶ 73 Petitioner's first hurdle is demonstrating that Juror 12's answer was material. The two incidents that the juror failed to disclose are very minor and occurred when the juror was a young teen. Neither incident involved violence or rape, the crimes for which petitioner was prosecuted. See United States v. Jones, 608 F.2d 1004, 1007 (4th Cir.1979) (declining to strike for cause a venireman *352 whose wife was a bank employee and one whose daughter-in-law had been the victim of a bank robbery in bank robbery trial. "The fact that a juror or his relative has been the victim of some crime, unrelated to the offense being tried, is, we think, only minimally relevant to the question of that juror's impartiality. Indeed, if the mere fact that a juror or his relative had been the victim of some crime unrelated to that being tried constituted grounds for discharge, it would become difficult, if not impossible, to assemble a jury panel."); United States v. Caldwell, 178 U.S.App. D.C. 20, 34, 543 F.2d 1333 (D.C.Cir.1974) (no cause to excuse a son and father-in-law of police officers from serving as jurors in the murder of a police officer); Mikus v. United States, 433 F.2d 719, 723-24 (2d Cir.1970) (no cause to excuse banker's wife in bank robbery trial).
¶ 74 A claim of juror misconduct in this circumstance is more compelling when a juror is closely associated with a victim of the same type of offense as that being tried. See City of Cheney v. Grunewald, 55 Wash.App. 807, 780 P.2d 1332 (1989) (court erred in refusing to excuse juror for cause in DUI (driving under the influence) trial where juror was a member of M.A.D.D. (Mothers Against Drunk Drivers) and whose niece was killed by an intoxicated driver); United States ex rel. De Vita v. McCorkle, 248 F.2d 1 (3d Cir.1957) (set aside a robbery conviction where it was disclosed at posttrial hearings that a juror had earlier been a robbery victim). Minimal sexual contact between two young boys is significantly different from the rape and murder charges Elmore faced. Thus, even assuming that Juror 12 had disclosed the two prior incidents, given the minimal nature of the sexual contact Elmore cannot demonstrate that the answers would have supported a challenge for cause as required by McDonough.
¶ 75 We reject Elmore's claim that juror misconduct resulted in a complete miscarriage of justice.

Proportionality Review
¶ 76 RCW 10.95.130 provides that this court conduct a proportionality review in every case in which the jury imposes a death sentence. Elmore challenged his sentence on the basis of disproportionality on direct review. In that review, the court considered both the crime and the defendant in light of other similar cases to determine whether death was imposed "`generally in similar cases, and not imposed wantonly and freakishly.'" Elmore, 139 Wash.2d at 308, 985 P.2d 289 (quoting State v. Brown, 132 Wash.2d 529, 555, 940 P.2d 546 (1997) (emphasis omitted)). The court said that if the facts of Elmore's case are similar to some of the facts in other cases in which the death penalty was upheld, the sentence is proportionate. Id. After its review, the court held that Elmore's sentence of death did not violate RCW 10.95.130. Id.
¶ 77 Elmore argues that his proportionality review was flawed because neither he nor the court had been provided accurate information about the pool of other "similar cases." He asserts that at least 18 reports were missing at the time the court engaged in its statutory review and probably more. Additionally, he alleges that many of the reports that have been filed are incomplete or inaccurate.
¶ 78 In every case where a death sentence is imposed, RCW 10.95.130 requires that the court, in addition to any appeal, determine
[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. . . . "[S]imilar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120.
RCW 10.95.130(b). RCW 10.95.120 requires that trial courts submit certain enumerated details in all cases where a person is convicted of aggravated first degree murder.
¶ 79 As this court stated in State v. Lord, 117 Wash.2d 829, 910, 822 P.2d 177 (1991), the purpose of the statutory review is to avoid random arbitrariness and imposition of the death sentence based on race. Precise uniformity among the cases is not required. *353 Id. The cases are "unique and cannot be matched up like so many points on a graph." Id. The review under RCW 10.95.130 is not constitutionally required. State v. Benn, 120 Wash.2d 631, 679, 845 P.2d 289 (1993). Thus, for reversal Elmore must show that any error in connection with the statutory review resulted in a complete miscarriage of justice. Cook, 114 Wash.2d at 812, 792 P.2d 506.
¶ 80 As the State points out, when this court decided Pirtle, 127 Wash.2d at 685-88, 904 P.2d 245, it reviewed 145 reported cases. Of these, only 41 defendants faced the death penalty and only 16 were sentenced to death. Id. Assuming that not every aggravated murder conviction is included in the database, the large number of cases that are available provide the court with a sufficient number to enable it to complete a valid and meaningful proportionality review. As the court has said repeatedly, precision is not required.[8]
¶ 81 In the direct appeal in this case, the court, using the existing database to evaluate proportionality, affirmed petitioner's sentence. Elmore, 139 Wash.2d at 308-11, 985 P.2d 289. Elmore fails to demonstrate that this court's review was so flawed that a complete miscarriage of justice has occurred. We hold that the statutory review performed in Elmore's direct appeal satisfied RCW 10.95.130.

Due Process Violations
1. Whether Charging Documents Violated Elmore's Due Process Rights.
¶ 82 The State charged Elmore with two aggravating circumstances: (1) the murder was committed to conceal a crime, and (2) the murder was committed in the course of, in furtherance of, and in immediate flight from the crime of rape. In his direct appeal Elmore claimed that, because the basis for the concealment aggravator was not specified, he was denied his constitutional rights pursuant to the Sixth, Eighth, and Fourteenth Amendments. He claims that he was misled by the charging document into believing that the crime he was allegedly concealing was Kristy's rape preceding her murder. He claims that if his attorney had known that the crime the State believed he was concealing was molesting Kristy when she was five, his attorney would have been able to give him different advice regarding his decision to plead guilty. The State argues that this issue was resolved on direct appeal and should not be reconsidered.
¶ 83 The constitution requires the State to inform the accused clearly of the nature of the criminal charge with sufficient specificity that he can prepare an adequate defense. Cole v. Arkansas, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948). A guilty plea "cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." McCarthy v. United States, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). Elmore claims that the information in this case failed to inform him as to the crime he was allegedly concealing.
¶ 84 Elmore recognizes that this issue was resolved on direct appeal. However, he urges that the court's decision on direct appeal conflicts with Supreme Court decisions in Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), and Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). In Jones the Supreme Court held that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." Jones, 526 U.S. at 243 n. 6, 119 S.Ct. 1215. In Schad, 501 U.S. at 633, 111 S.Ct. 2491, the Court said that "nothing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of `Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction." Elmore says that the State's failure to make clear that the crime he was concealing was molesting Kristy when she was five violates the Court's pronouncements in Jones and Schad.
*354 ¶ 85 The aggravating circumstance at issue, concealment of a crime, is set forth in RCW 10.95.020(9). This court has rejected due process challenges to this statutory aggravator. In State v. Jeffries, 105 Wash.2d 398, 717 P.2d 722, cert. denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 301 (1986), this court held that due process does not require that the specific crime be charged and included in the jury instructions. Id. at 419-20, 717 P.2d 722. See also State v. Gentry, 125 Wash.2d 570, 602-03, 888 P.2d 1105, cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 79 (1995) (predicate crime need not be identified).
¶ 86 Neither Jones or Schad dictates a different result. The exact crime is not an element of the aggravating circumstance under the statute. Additionally, the jury here was required to determine, beyond a reasonable doubt, whether the murder was committed to conceal a crime. Thus, Elmore did receive the protections dictated by Jones and Schad. Elmore presents no convincing reason for this court to reconsider its decision.
2. Whether Unlimited Jury Access to a Tape Recorder During Deliberations Violated Due Process.
¶ 87 Elmore claims that counsel's failure to object to redaction of his statements of remorse from his taped confession that was given to the jury to play in the jury room fell below the objective standard of reasonableness under prevailing professional norms. The redacted portion of the statement was as follows:
We barely tolerated each other. . . . Which, again, is probably my fault. After all this was said and done, then I started to realize where I had made a lot of mistakes with Kristy.' Cause the only time I ever talked to Kristy was to yell at her for something she didn't do that she was supposed to do. I didn't ever spend any time with Kristy. Maybe this is because of the first time, I felt so guilty about it.
15 Verbatim Report of Proceedings (Mar. 7, 1996) at 2392 (capitalization omitted).
¶ 88 Mr. Komorowski says in his affidavit that he would have objected to a redacted confession tape if he had been aware that the jury would have unlimited access to Elmore's confession in the jury room.
¶ 89 Following the jury's decision in this case, Elmore moved for a new sentencing hearing based on the jury's unsupervised access to a recording device on which to listen to the redacted confession. The motion was denied, and Elmore assigned error to that ruling on direct appeal, arguing that the jury placed undue emphasis on the tapes. This court rejected Elmore's argument, stating that the confession was the case for both sidesit "both described the crime and reflected Elmore's decision to come back and take responsibility." Elmore, 139 Wash.2d at 297, 985 P.2d 289. Although Elmore now presents this issue as one of ineffective assistance of counsel, it is essentially the same argument that he made on direct appeal. He has failed to demonstrate that this court's decision on direct appeal was erroneous or harmful. We have not been presented with a reason to reconsider this issue.

CONCLUSION
¶ 90 We hold that Mr. Elmore has failed to establish that he is under an unlawful restraint and deny his personal restraint petition.
WE CONCUR: GERRY L. ALEXANDER, C.J., TOM CHAMBERS, CHARLES W. JOHNSON, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, BOBBE J. BRIDGE, JJ.
SANDERS, J. (dissenting).
[L]ives depend upon the effectiveness of counsel in trying capital cases.
Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L.Rev. 299, 303 (1983).
¶ 91 Clark Elmore received ineffective assistance of counsel at both the guilt and penalty phases of his trial. Notwithstanding counsel's multiple and severe errors, the majority upholds Mr. Elmore's death sentence.
¶ 92 The United States Supreme Court has stated, "[t]he purpose [of the effective assistance guaranty of the Sixth Amendment] is simply to ensure that criminal defendants *355 receive a fair trial." Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because Mr. Elmore was deprived of such fairness here due to counsel's deficient and prejudicial performance, I strongly dissent.
¶ 93 The Sixth Amendment to the United States Constitution guarantees "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." Our state constitution similarly provides, "[i]n criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel. . . ." Const. art. I, § 22. A criminal defendant's right to counsel is, in addition to a right to have counsel appointed, a right to meaningful representation. Accordingly, "the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).
¶ 94 To prevail on a Sixth Amendment ineffectiveness of counsel claim, Mr. Elmore must establish first that counsel's performance was deficient, that is, counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms." Strickland, 466 U.S. at 687-88, 104 S.Ct. 2052. Second, Mr. Elmore must demonstrate he was prejudiced by counsel's errors. In other words he most show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; State v. Thomas, 109 Wash.2d 222, 226, 743 P.2d 816 (1987).
¶ 95 Here, counsel's failure to competently investigate Mr. Elmore's mental deficiencies, counsel's failure to attempt to negotiate a plea bargain with the prosecutor, and counsel's affirmative agreement to Mr. Elmore appearing in shackles before the jury collectively deprived Mr. Elmore of effective assistance of counsel in violation of his constitutional rights. In my view Mr. Elmore has demonstrated the severity of counsel's errors individually, and the cumulative effect of such errors is sufficient "to undermine confidence in the outcome" of Mr. Elmore's trial. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. I would therefore grant Mr. Elmore's personal restraint petition and vacate his conviction and death sentence.
I. Counsel's Failure To Competently Investigate Mr. Elmore's Mental Deficiencies
¶ 96 Jon Komorowski, appointed lead counsel for the defense team, became aware through investigation that Mr. Elmore had suffered numerous head injuries, been exposed to Agent Orange in Vietnam, worked with chemicals as a mechanic for most of his life, and grew up in an area with a history of crop dusting. Findings of Fact (Sept. 10, 2004) (FOF) at 17-19. Despite such knowledge, Mr. Komorowski failed to have Mr. Elmore evaluated by a neuropsychologist or neurotoxicologist until after Mr. Elmore's conviction. Counsel acknowledged,
I did not consider the potential importance of further exploring Mr. Elmore's history for evidence of exposure to neurotoxins. Again, this was not a strategic decision, and instead was the product of our inexperience.
Decl. of Jon C. Komorowski at 5 (reproduced in Pers. Restraint Pet. & Br. in Support, Attach. 2). Mr. Elmore now contends counsel's failure to retain mental health experts for the purpose of investigating Mr. Elmore's possible brain damage and neuropsychological deficiencies constitutes ineffective assistance of counsel. I agree.
¶ 97 Strickland, 466 U.S. at 691, 104 S.Ct. 2052, demands counsel conduct a reasonable investigation under prevailing professional norms. "`In a capital case the attorney's duty to investigate all possible lines of defense is strictly observed.'" Stouffer v. Reynolds, 168 F.3d 1155, 1167 (10th Cir.1999) (quoting Duvall v. Reynolds, 139 F.3d 768, 777 (10th Cir.1998)).
¶ 98 Here, counsel's failure to consult mental health experts in the penalty phase (given counsel's knowledge of Mr. Elmore's history) was deficient as it fell below the "objective standard of reasonableness" under "prevailing professional norms" as part of the duty to investigate. Strickland, 466 U.S. at 688, 104 *356 S.Ct. 2052. Court-appointed death penalty expert Dennis Balske concluded Mr. Komorowski's overall performance was objectively unreasonable and his most salient error was his failure to investigate Mr. Elmore's "mental health issues." Decl. of Dennis Balske at 14 (reproduced in Pers. Restraint Pet. & Br. in Support, Attach. 1). Mr. Balske observed,
Certain events in a client's past . . . are well understood to mandate further investigation, e.g., a history of trauma; head injury; neurological abnormalities; mental illness in the client and the family; and significant exposure to chemicals, including controlled substances. If the defendant has a history of brain trauma or head injury, competent counsel would retain an expert trained in neuropsychology and/or neurology, at a minimum, to do an evaluation. Similarly, a family history of seizure disorders also raises a question regarding neurological damage. Substantial exposure to toxic substances calls for an evaluation by an appropriate specialist such as a neurotoxicologist. A psychiatrist may be necessary to understand the interrelation between the medical conditions and other mental health issues, e.g., trauma, in the client's life.
Id. at 12. Mr. Balske concluded that in light of Mr. Elmore's known history and the fact that "Mr. Elmore himself did not understand why he had committed this crime. . . . [R]easonably competent counsel would have identified the possibility of neurological impairment and the existence of significant trauma in Mr. Elmore's life." Id. at 14-15.
¶ 99 The importance of mitigating evidence of brain damage is significant. In Rompilla v. Beard, 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), the United States Supreme Court determined lawyers were deficient in failing to examine a court file on the defendant's prior conviction-a file which led to "a range of mitigation leads that no other source had opened up." The files contained test results suggesting Rompilla suffered from schizophrenia and other disorders, and evidence that Rompilla was raised in a severely abusive household, that his parents were severe alcoholics, and that Rompilla's mother drank throughout her pregnancy with him. Postconviction mental health experts found that Rompilla suffered from organic brain damage and "`extreme mental disturbance significantly impairing several of his cognitive functions.'" Id. at 392, 125 S.Ct. 2456 (quoting Rompilla v. Horn, 355 F.3d 233, 279 (3d Cir.2004) (Sloviter, J., dissenting)).
¶ 100 The Court observed, "[t]he jury never heard any of this and neither did the mental health experts who examined Rompilla before trial." Id. It opined the "undiscovered `mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal" of [Rompilla's] culpability.'" Id. at 393, 125 S.Ct. 2456 (alteration in original) (quoting Wiggins v. Smith, 539 U.S. 510, 538, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 398, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000))). As such, the Court concluded, "the likelihood of a different result if the evidence had gone in [was] `sufficient to undermine confidence in the outcome' actually reached at sentencing." Id. at 393, 125 S.Ct. 2456 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052).
¶ 101 In Prowell v. State, 741 N.E.2d 704 (Ind.2001), the Indiana Supreme Court concluded Prowell had received ineffective assistance of counsel in his capital case. Despite counsels' suspicions that Prowell suffered from severe mental illness, counsel did not investigate such issues until two and one-half months after Prowell's guilty plea. The court stated, "[w]ithout the assistance of a psychologist or psychiatrist and a mitigation investigator, Prowell's trial counsel did not have the basic information necessary to advise Prowell as to a plea of guilty but mentally ill, nor did they have the ability to argue persuasively for a plea agreement on that basis." Id. at 714.
¶ 102 Mr. Elmore's defense team consulted three mental health experts prior to the penalty phase of trial and the experts' statements highlight the significance of counsel's failure to investigate Mr. Elmore's head injuries and exposure to toxins. Dr. Ronald Kleinknecht, hired by the defense team to assist in communicating with Elmore, was not given information regarding Mr. Elmore's "life long exposure to neurotoxic *357 agents and a series of head injuries." FOF at 23. Dr. Kleinknecht indicated had he been given such information, "he would have likely referred Elmore for neurotoxic testing." Majority at 341. Dr. Ronald Roesch was also hired by the defense team to assist in communications with Mr. Elmore because of Dr. Roesch's background in forensics, psychopathy, and future dangerousness. FOF at 27. Dr. Roesch was also not given information regarding Mr. Elmore's history of potential brain injury and stated had he been aware of Mr. Elmore's history, he would have recommended a neuropsychological evaluation.
¶ 103 Postconviction evaluations performed by Dr. Dale Watson, Dr. George Woods, and Dr. Raymond Singer[1] revealed evidence of Mr. Elmore's neuropsychological deficiencies and indicated he was suffering extreme emotional disturbance at the time he committed the crime, a mitigating factor under RCW 10.95.070(2). Dr. Dale Watson, a neuropsychologist, performed a neuropsychological evaluation of Mr. Elmore. FOF at 44. According to Dr. Watson, Mr. Elmore suffered from neuropsychological deficits which contributed to his lifelong pattern of impulsivity, poor judgment, and vulnerability to stress. FOF at 50. Mr. Elmore's history of violent abuse by his father, his stutter, his mother's exposure to toxins during her pregnancy, and his series of head injuries and certain illnesses were all factors significant to Dr. Watson's ultimate conclusion. In Dr. Watson's opinion, Mr. Elmore's neuropsychological deficits contributed to his crime and his behavior during, before, and after the crime was consistent with brain damage. FOF at 50. Dr. Watson believes Mr. Elmore was suffering from an extreme emotional disturbance at the time he committed the crime. Id. 51-52.
¶ 104 Dr. George Woods is a physician specializing in neuropsychiatry. In Dr. Woods' opinion, Mr. Elmore suffers brain impairment and Mr. Elmore's "abusive, violent, alcoholic and chaotic family life compounded his cognitive defects, explaining his mental state at the time of the offense." FOF at 56. Dr. Woods believes Mr. Elmore's "neuropsychological deficits, contributed in a direct way to an extreme emotional disturbance and inability to affectively conform his behavior." FOF at 60. Further, in Dr. Woods' opinion Mr. Elmore was suffering from extreme emotional disturbance at the time of his crime which "impaired his affective ability to conform his conduct to the requirements of the law." Id. He believes Mr. Elmore's neuropsychological deficits combined with fear, anger, and frustration "overwhelmed Mr. Elmore and moved him to a level of violence that he had not committed before or since." Id. at 62.
¶ 105 Dr. Raymond Singer is a neuropsychologist and neurotoxologist. In Dr. Singer's opinion Mr. Elmore suffers from functional deficits consistent with significant exposure to various neurotoxic agents over the course of a lifetime. Dr. Singer believes Mr. Elmore's neuropsychological deficits have manifested in Mr. Elmore's learning difficulties, attention span, and problems "inhibiting himself in various circumstances." FOF at 70. Dr. Singer believes such deficits "ultimately culminate[d] in [Mr. Elmore's] crime." Id.
¶ 106 Due to his failure to retain such expert advice, Mr. Komorowski was unable to present the above-stated mitigating evidence for purposes of plea bargaining. Further, Mr. Elmore's jury heard nothing of Mr. Elmore's brain damage or neuropsychological difficulties despite Mr. Komorowski's awareness, through the advice of a capital case consultant, that such evidence did not contradict evidence of remorse and that, to the contrary, such evidence could, in fact, enhance the evidence of remorse. FOF at 37. Dennis Balske stated,
The failure to consult with experts who could accurately assess Mr. Elmore's brain dysfunction was particularly harmful in this case because without such evidence the jury was left with no explanation for the crime. . . . [T]he jury was given no insight as to why Mr. Elmore would commit this crime.
Decl. of Dennis Balske at 21. "In the sentencing phase of a capital case, `[what] is essential is that the jury have before it all *358 possible relevant information about the individual defendant whose fate it must determine.'" Strickland, 466 U.S. at 705, 104 S.Ct. 2052 (alteration in original) (quoting Jurek v. Texas, 428 U.S. 262, 276, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), overruled in part on other grounds by Abdul-Kabir v. Quarterman, ___ U.S. ___, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007)). "The mitigating evidence counsel failed to discover and present in this case is powerful." Wiggins, 539 U.S. at 534, 123 S.Ct. 2527. Due to the tremendously compelling nature of the postconviction experts' testimony regarding Mr. Elmore's brain impairment, "there is a reasonable probability that at least one juror would have struck a different balance" had they heard such evidence. Id. at 537, 123 S.Ct. 2527. In my view Mr. Elmore was prejudiced by counsel's failure to competently investigate Mr. Elmore's mental health deficiencies.
II. Counsel's Failure To Attempt To Negotiate a Plea Bargain
¶ 107 Mr. Elmore's counsel did not attempt to negotiate a plea bargain with the prosecutor. He stated in an affidavit,
I . . . believe that I told the prosecutor that Mr. Elmore would probably enter a guilty plea no matter what the prosecutor decided. I do not recall specifically attempting to negotiate a deal with the prosecutor whereby Mr. Elmore would plead guilty in exchange for the prosecutor either agreeing not to seek the death penalty or agreeing by stipulation or some other means at sentencing that a life sentence was the appropriate sentence. . . .
I did not attempt to negotiate a plea bargain whereby the prosecutor would agree to dismiss one of the aggravating circumstances in exchange for a guilty plea. I did not consider how the existence of two aggravating circumstances could negatively affect proportionality review if a death sentence was imposed.
Decl. of Jon Komorowski at 2-3.
¶ 108 Because Mr. Elmore alleges ineffective assistance of counsel, he "`must show in the record' the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." In re Pers. Restraint of Hutchinson, 147 Wash.2d 197, 206, 53 P.3d 17 (2002) (quoting State v. McFarland, 127 Wash.2d 322, 336, 899 P.2d 1251 (1995)). This test is easily met here as Mr. Komorowski's failure to negotiate for a plea bargain was based on neither strategy nor tactic; nor was his failure to negotiate the product of reasonable profession judgment. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052 (defendant claiming ineffective assistance of counsel "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment"). Dennis Balske observed,
In a case where [a] defendant is competent to proceed and still wants to plead guilty, reasonably competent counsel would make all efforts to attempt to obtain a plea offer that avoids the possibility of a death sentence in exchange for a guilty plea. If trial counsel is unable to obtain such a bargain and the defendant nonetheless insists on pleading guilty after exhaustive discussions with counsel, reasonably competent counsel would seek to minimize the number of aggravating factors by persuading the prosecuting attorney to dismiss one or more aggravating factors in return for the plea.
Decl. of Dennis Balske at 11.
¶ 109 Because Mr. Komorowski's failure to attempt to negotiate a plea bargain was simply a negligent oversight and not the result of strategy or tactic, I agree with Mr. Elmore that such failure constitutes ineffective assistance of counsel. Had counsel even attempted negotiation, there is a reasonable probability that he might, at the very least, have convinced the prosecutor to dismiss one of the two aggravators. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (to demonstrate prejudice, defendant alleging ineffective assistance of counsel must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").
III. Counsel's Failure To Object to Mr. Elmore Appearing before the Jury in Shackles
¶ 110 On the first day of voir dire at his sentencing trial, Mr. Elmore appeared before *359 the jury panel in shackles. He now argues counsel's affirmative agreement to the shackling constitutes ineffective assistance of counsel. The majority agrees with Mr. Elmore that "counsel's failure to object to his client appearing before the jury in shackles fell below an objective reasonableness standard for counsel in a capital case." Majority at 348. Nevertheless, the majority asserts counsel's error is harmless, distinguishing our decision in State v. Finch, 137 Wash.2d 792, 975 P.2d 967 (1999), on the grounds that "Elmore was shackled only on the first day of the sentencing trial." Majority at 348. The fact that Mr. Elmore was shackled before the jury for only one day is not particularly persuasive since Mr. Elmore's shackled appearance, even for one day, is sufficient to "indicate[] to the jury that [Mr. Elmore] is viewed as a `dangerous' and `unmanageable' person . . . who cannot be controlled, even in the presence of courtroom security." State v. Finch, 137 Wash.2d at 863, 975 P.2d 967.
¶ 111 The majority continues, "unlike the defendant in Finch, Elmore's trial strategy was to demonstrate remorse and to accept responsibility," and "[t]his evidence was sufficient to off-set any implication of dangerousness created by Elmore's appearance in shackles." Majority at 348. This makes little sense. By affidavit Mr. Komorowski testified one of the defense team's "primary mitigation themes" in addition to remorse was Mr. Elmore's "lack of future dangerousness." Decl. of Jon Komorowski at 4. In Finch we held, "[s]hackling sends a message to the jury that, in the court's view, the defendant is so dangerous that he or she cannot be allowed to attend the proceedings, even with other security measures, without physical restraints." Finch, 137 Wash.2d at 864-65, 975 P.2d 967. Finch did not hold that the shackling of a criminal defendant conveys feelings of remorse.
¶ 112 "[F]uture dangerousness or the probable lack of future dangerousness of the defendant is a relevant factor for a jury's consideration in deciding whether to impose a death sentence." Finch, 137 Wash.2d at 864, 975 P.2d 967; see also Duckett v. Godinez, 67 F.3d 734, 748 (9th Cir.1995) ("In the penalty phase of a capital trial, the jury knows the defendant is a convicted felon. But the extent to which he continues to be dangerous is a central issue the jury must decide in determining his sentence."). I agree with the majority that counsel's failure to object to his client appearing before the jury in shackles fell below Strickland's standard for reasonableness. Unlike the majority, I believe Mr. Elmore was unfairly prejudiced by counsel's error and I do not agree the error was harmless. See Finch, 137 Wash.2d at 865, 975 P.2d 967 (presence of the defendant in physical restraints "prejudiced him in such a manner that warrants a reversal of his death sentence").
¶ 113 Because counsel's performance was deficient and prejudicial enough "to undermine confidence in the outcome" of Mr. Elmore's trial, his petition for relief should be granted and his conviction and death sentence vacated. Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
¶ 114 I therefore dissent.
NOTES
[1] The facts are drawn from this court's opinion in Elmore, 139 Wash.2d 250, 985 P.2d 289, and from the Trial Court Findings of Fact (FOF) entered by the Whatcom County Superior Court (Sept. 10, 2004 reference hearing).
[2] Def.'s Ex. 13 (Social History); see also Def.'s Ex. 12 (Clark Elmore Life History) (located in Clerk's Papers, Small Exhibits and Large Exhibits).
[3] Petitioner's mother advised the defense team that the injury was not significant. The trial team did not believe that neurological testing was indicated based on the incident.
[4] While Mr. Komorowski admits that he did not further explore petitioner's history of exposure to neurotoxins because of inexperience, he was certainly not an inexperienced attorney in 1995. FOF at 19. He was admitted to practice in 1979 and is currently the chief deputy public defender for Whatcom County. Prior to working with petitioner, he represented people charged with various felony crimes, including aggravated murder in the first degree. FOF at 8-9.
[5] See Strickland, 466 U.S. at 699, 104 S.Ct. 2052 (decision not to present testimony of family members or psychological evaluations was a reasonable strategic choice because evidence: (1) would have been of little help, (2) would have opened door to damaging evidence of defendant's criminal history, and (3) was unnecessary because the judge had already heard at plea colloquy the substance of defendant's financial and emotional troubles); Burger v. Kemp, 483 U.S. 776, 791-94, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (failure to present any mitigating evidence, including defendant's own testimony or testimony of defendant's mother that he had an exceptionally unhappy and physically abusive childhood, or expert psychological testimony, was reasonable professional judgment because the testimony would have shown defendant's unremorseful attitude, violent tendencies which were at odds with the defense strategy, and his prior criminal acts); Harris v. Vasquez, 949 F.2d 1497, 1525 (9th Cir.1990), cert. denied, 503 U.S. 910, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992) (failure to present psychiatrists to rebut damaging testimony of the government's psychiatric expert was competent assistance because: (1) a psychiatric defense theory would conflict with his alibi defense, and (2) testimony would open the door to equally persuasive psychiatric opinions that reached a different conclusion).
[6] The declarations summarized herein are contained in the petitioner's opening brief, Personal Restraint Petition and Brief in Support, as attachments.
[7] According to the interviewer, the juror mentioned three prior incidents. During a later deposition the juror testified that there had been only two sexual abuse incidents. The deposition of Juror 12 has been sealed to maintain his privacy.
[8] This court recently held that "abhorrent killings" of Gary Ridgway, the "Green River Killer," "standing alone, do not render the death penalty unconstitutional or disproportionate." Cross, 156 Wash.2d at 624, 132 P.3d 80.
[1] All three experts were deemed "duty qualified" and credible by the trial court. FOF at 5.