# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| In Re the Personal Restraint Petition of:<br><br>MICHAEL DON OLMSTED,<br><br>                 Petitioner, | No.  48730-6-II<br><br><br><br>UNPUBLISHED OPINION |

SUTTON, J. — In this personal restraint petition, Michael D. Olmsted challenges his conviction for second degree assault.  Olmsted argues that the trial court violated the time for trial rules by granting a continuance when the victim suffered a heart attack.  Olmsted also raises numerous instances of alleged prosecutorial misconduct and ineffective assistance of counsel. Olmsted fails to meet his burden to show either a constitutional error resulting in actual and substantial prejudice or a nonconstitutional error resulting in a fundamental miscarriage of justice. Accordingly, we deny his PRP.[1]

---

[1] Olmsted also asks that we decline to impose appellate costs for his PRP.  The State claims that "[t]his is a civil matter, and costs are statutory."  Br. of Resp. at 26.  While the State is correct, the imposition of costs in a personal restraint petition filed as a collateral attack to a criminal conviction are governed by RCW 10.73.160, the same statute which governs imposition of appellate costs in a direct appeal.  Therefore, if the State decides to pursue costs for this personal restraint petition by filing a cost bill, Olmsted may then object, and a commissioner of this court will determine whether it is appropriate to impose appellate costs under RAP 14.2.

FACTS

The State charged Olmsted with second degree assault (domestic violence) for an assault against Olmsted's girlfriend, Amy Yeager, which occurred on February 1, 2013. The State also included an alternative charge of attempted second degree assault.

After several continuances (which are not challenged in this PRP), Olmsted's trial date was set for June 3. On May 28, the State filed a motion to continue because Yeager was "medically unable to appear for trial." Clerk's Papers (CP) at 12. The State attached a letter from Dr. Loran Yehudai that stated,

> Ms. Yeager was treated at PeaceHealth Southwest from May 16-18 with an acute heart attack. Her recovery is on-going, and I recommend delaying her trial participation scheduled for June 3. Her next appointment with me is on June 4, and her condition and medical appropriateness for participation will be evaluated at that time.

CP at 14. At the hearing on the motion to continue, the prosecutor told the trial court,

> [W]e are asking for a continuance. [We] [b]ecame aware last week that the named victim in our case had a heart attack. She was in ICU for three days, Your Honor. She's out now. Next Tuesday, the 4th, where [sic] we'll still be in trial, she has an appointment. There's a stent -- a stent in her heart that they're going to look to maybe remove that day or not. The doctor has written a letter saying that they don't recommend that she, right now, be in any stressful situation. We clarified with the doctor just to see what -- what that really meant, like how much time, and he said about two to three weeks, he would think. They will know more on Tuesday after that appointment.

1 Verbatim Report of Proceeding (VRP) at 36-37. Olmsted objected to the continuance. Olmsted's counsel stated that he had spoken with a nurse and they would not give him additional information. Olmsted asserted that he "heard it on the streets" that the victim did not have a heart attack, but had only suffered chest pains. 1 VRP at 38. The trial court granted the continuance

2

and reset Olmsted's trial date to July 8. The trial court also found that the continuance was an excluded period for calculating the time for trial.

## I. TRIAL TESTIMONY

Olmsted's jury trial commenced on July 8. Yeager testified at trial regarding the injuries that she suffered from the assault. Yeager stated that when she arrived at the urgent care clinic near her house her face was swollen and she was having trouble with her jaw. Yeager also had bruises on her forehead and face. She testified that she had a scratch on her arm and her leg. Yeager went from the urgent care clinic to the emergency room where the doctors checked to see if her nose or jaw were broken.[2] After she got home from the hospital, Yeager had trouble breathing because her nose was swollen and she could not chew for three days because of the pain in her jaw.

Yeager testified that the bruises lasted for 12 days. It was a week before Yeager could wear her glasses because of the pain and the swelling resulting from her facial injuries. For four days, the pain in her head made it difficult to sleep. Yeager testified that a photo, admitted as Exhibit 19, was taken 10-12 days after the assault. The photo showed that she still had a black eye and bruising over her other eye. Yeager also testified that she had a scar on her eye and a scar on her arm from her injuries.

Dr. Carolyn Martin, an emergency room physician, treated Yeager on the night of the assault. Dr. Martin testified that Yeager stated that she had been hit multiple times in the face. Yeager also told Dr. Martin that she was hit on her hand with needle-nose pliers. Dr. Martin

---

[2] Neither her nose nor her jaw were broken.

observed swelling and bruising on Yeager's jaw, forehead, and eyes. Yeager also complained of pain in her hand, but Dr. Martin did not observe any obvious injury to Yeager's hand. Dr. Martin testified that, based on her experience, Yeager's injuries were not consistent with suffering a single blow. Dr. Martin also testified that bruises usually last for two weeks before they are completely healed.

On cross-examination, Dr. Martin testified that she did not document any injury to Yeager's hand. Dr. Martin also testified that when she examined Yeager, Yeager was able to open and close her mouth. Yeager was also able to speak in complete sentences without mumbling. Dr. Martin stated that in an interview with Olmsted's investigator, the investigator asked her if Yeager's injuries were severe and Dr. Martin responded,

> On this day, no, in the sense there was no obvious fractures. Her injuries were superficial. They were painful. She had a lot of bruising on her face that was seen in pictures, consistent with being hit in the face with a fist. She had a complaint of tenderness to her chest, but she had no injury to her lung, bruising, or deformity. And she complained about her hand, but there was also no bruising or deformity to her hand.

2 VRP at 139. Olmsted also asked Dr. Martin if Yeager suffered any impairment to her jaw and Martin testified,

> No, she was able to speak, she was able to talk. It hurt to open her mouth and close. But impairment, we actually didn't test anything to see if she would eat or drink, but she was able to swallow the Motrin without difficulty. That's as much as I can tell you about impairment.

2 VRP at 140. Dr. Martin testified that Yeager told the triage nurse that she had been hit 10 to 15 times. Yeager told Dr. Martin that she had been hit multiple times.

Officers Mary Jane Long and David Krebs of the City of Vancouver Police Department responded to the incident. Officer Long contacted Yeager at the urgent care clinic. Officer Long

observed that Yeager was already developing two black eyes, had a red, swollen bump on her forehead, had cuts on her nose and right eye, and her nose was bleeding. Officer Long testified that when she contacted Yeager, Yeager was mumbling and her jaw seemed to be hanging abnormally. Yeager also could not close her mouth all the way. Officer Krebs testified that when he contacted Yeager, he observed two distinct black eyes, swelling in her face and jaw, and blood on her face. Yeager was also having trouble speaking and could not move her jaw properly

Olmsted testified that Yeager kicked him in the testicles after he told her to leave the house because she had been using methamphetamine. *State v. Olmsted*, noted at 187 Wn. App. 1023, 2015 WL 2085567, at *2 (2015). He claimed he reflexively slapped Yeager once and then she began hitting him. *Olmsted*, 2015 WL 2085567, at *2.

During Olmsted's cross-examination, the following exchange took place:

[STATE]: Do you recall talking to your father on February 1st, 2013, a jail phone call?

[OLMSTED]: I've had several.

[STATE]: Okay. Do you remember saying that they can't convict you for striking your bitch?

[OLMSTED]: Yeah, I think I recall that, yes.

[STATE]: Okay. Do you recall saying that it was just a reaction when you hit her?

[OLMSTED]: I -- I don't recall saying that exactly.

[STATE]: Okay.

[OLMSTED]: It could have been -- yeah, it could have possibly. I -- I don't know. I don't know exactly what the conversation was about.

[STATE]: Do you remember saying, "She -- she kicked me and I lost my temper?"

[OLMSTED]: No.

[STATE]: Okay. Do you remember talking to your dad on February 2nd, 2013?

[OLMSTED]: I -- I suppose I could have. I don't recall every conversation I had with my pop and what day it was on.

[STATE]: Do you remember saying, "All I did was slap her.  It was an instant thing, a reaction?"

[OLMSTED]: I -- I don't recall exactly what the conversations were with my father that I had word for word.

[STATE]: Okay.  Do you remember saying on multiple occasions that you just blacked out, you're not sure?

[OLMSTED]: No.

[STATE]: You didn't?

[OLMSTED]; I don't -- I don't -- I don't recall ever saying that I on multiple occasions that I blacked out.

[STATE]: Okay.  Do you recall on February 2nd, 2013 a phone call at 16:37 saying -- your Dad saying, "I told you, don't hit her," and your response, "But I couldn't f[*****]g stop"?

[OLMSTED]: I recall saying something of that nature, yes, because I was talking in regards of pain --

[STATE]: (Inaudible.)  Thank you.

[OLMSTED]: -- and it was a reaction to the pain that I felt from it, yeah.  So I didn't have – I didn't have -- it wasn't a thought out process, no.

3 VRP at 424-25.

## II. CLOSING ARGUMENT

During closing argument, the State made the following relevant statements regarding substantial bodily harm:

> So what makes something substantial?  It's immediately noticeable to people.  People see it and instantaneously know what happened.  It's substantial when it lasts for some time.  It's substantial when you have injuries two weeks later.  It's substantial when you have pain that lasts for over a week, two weeks even.  It's substantial when you have these bruises.  It's substantial when you have scar[r]ing six months later, scar[r]ing that, when you look at it every day, it makes you think about what has happened.  That's substantial.
>
> . . . .
>
> The next day, her entire head, her entire face is in pain.  And she talks about this.  She said for a solid week, she could not wear her glasses.  Her nose was so swollen and so sore that she couldn't even take that little bit of pressure from her glasses.  And you saw her: she wears her glasses every time she looked at a

6

photograph, when she was asked to read; she needs those glasses, and that's what she testified to as well. For a solid week, she can't wear them. She told you she has to have other people read things for her, she can't really see anything, and to use her phone, she has to use a magnifying glass. That's substantial.

In the days that follow, she also talks about the bruises on her face, the bruises everywhere, and how it was impossible to cover them up. When I asked her, is there any way you could put makeup, cosmetics to kind of, you know, make it look less bad, she said no, she couldn't even touch her face. She said at one point, for a solid week, she can't touch her face because she's in so much pain. She says at one point she accidentally glances her nose with her hand; for the rest of the day, severe shooting pain. So she can't wear cosmetics. She can't even put it on because it hurts too badly. So those deep bruises all over her face, they're out there for everyone to see.

She testified that the injuries were so bad to every place except for the back of her head. That's the only place where he didn't punch her, is the back of her head. The injuries are so bad, for up to a week, she couldn't even sleep anyway but exactly like this. If she turns from side to side, there's too much pain because of the swelling, because of the abrasions. When you can't sleep, when you can't turn for a week, that is substantial. That is highly affecting your quality of life, it's affecting the pain, the injury. It's not just what you look like, but how you just operate every day, how you go through your day.

3 VRP at 501-04. The prosecutor also made the following statements:

We know she can't close her teeth together.

. . . .

We know in this case her jaw was impaired. There is no question.

. . . .

The Defense Attorney said in their opening and then said again in their closing, "Well, he couldn't have damaged everything because he was so hurt. He couldn't have damaged the TV; he couldn't have damaged the mirror. I mean, he was too hurt." But I mean, come on. He's walking over a mile, he's following Amy, he's confronting strangers sitting in their car aggressively, being combative with the police. I think he probably has the ability.

2 VRP at 503, 508, 552.

And the prosecutor made the following arguments regarding Olmsted's statements to his father while he was in jail:

7

So in these recorded jail phone calls, these monitored jail phone calls, the Defendant re -- refutes himself on self-defense. He says it was an instantaneous reaction. "I lost my temper. I couldn't f[*****]g stop myself. They can't convict me for slapping my bitch." That's not being in fear, that's not trying to prevent an assault, that's retaliation. Retaliation is not self-defense.

3 VRP at 555.

The jury found Olmsted guilty of second degree assault. Olmsted was sentenced under the Persistent Offender Accountability Act (POAA)[3] and received life in prison without parole. Olmsted appealed his conviction, and we affirmed.

## ANALYSIS

### I. PRP STANDARDS

To be entitled to relief in a personal restraint petition, the petitioner must establish either a constitutional error that caused actual and substantial prejudice or a nonconstitutional error that is "'a fundamental defect resulting in a complete miscarriage of justice.'" *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013) (quoting *In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 251, 172 P.3d 335 (2007)).

A personal restraint petition must state with particularity the factual allegations underlying the petitioner's claims. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992). And the petitioner's factual allegations must have evidentiary support. *In re Rice*, 118 Wn.2d at 886. The petitioner may not rely on mere speculation, conjecture, or inadmissible hearsay. *In re Rice*, 118 Wn.2d at 886. Bald assertions and conclusory allegations are insufficient to support the petitioner's claims. *In re Rice*, 118 Wn.2d at 886. For "matters outside the existing

---

[3] RCW 9.94A.570.

8

record, the petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief." *In re Rice*, 118 Wn.2d at 886.

If the petitioner fails to show either actual and substantial prejudice or a fundamental defect, we deny the personal restraint petition. *Yates*, 177 Wn.2d at 17. If we are convinced the petitioner has met his or her burden to prove actual and substantial prejudice or a fundamental defect, we grant the petition. *Yates*, 177 Wn.2d at 18.

## II. MOTION TO CONTINUE

Olmsted argues that the trial court erred by granting a continuance based on the State's representation that Yeager had an acute heart attack and that it was medically necessary to delay Yeager's participation in the trial. Olmsted also argues that the prosecutor committed misconduct by making material misrepresentations to the trial court regarding Yeager's heart attack. And Olmsted argues that he received ineffective assistance of counsel because his counsel failed to challenge the asserted grounds for the continuance. These claims are meritless.

Under CrR 3.3(b)(1), a defendant detained in jail must be brought to trial within 60 days. However, the trial court has the discretion to grant a motion to continue "when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." CrR 3.3(f)(2). Here, Olmsted argues that the trial court improperly granted the motion to continue because the prosecutor made false representations to the trial court and the information before the trial court was insufficient to justify granting a continuance.

Olmsted argues that the prosecution's assertion that Yeager had a heart attack was false; however, Olmsted presents no evidence to substantiate his claim that Yeager did not have a heart

attack. Instead, Olmsted states that in an April pretrial interview, Dr. Martin did not identify heart problems as part of Yeager's medical history when Yeager was treated in the emergency room in February. Olmsted seems to claim that because Yeager had no history of heart problems in early February, she could not have had a heart attack almost four months later in late May. This claim has no merit. The prosecutor presented a letter from the cardiologist who treated Yeager's heart attack that stated that Yeager had suffered an acute heart attack. There is nothing in the record that substantiates a claim that the prosecutor's assertions regarding the victim's heart attack were false.

Olmsted also appears to take issue with the fact that the prosecutor provided the trial court with information that was not included in the cardiologist's letter. At the continuance hearing, the prosecutor informed the trial court that she had followed up with the doctor and, based on that conversation, she had learned that Yeager had been in the ICU, Yeager had a heart stent implanted that may be removed, and the doctor recommended delaying Yeager's participation in trial for two to three weeks. Olmsted argues that the trial court erred in relying on this information because this information was not included in the cardiologist's letter and was unsubstantiated. Again, Olmsted fails to provide any evidentiary support for the claim that the facts presented by the prosecutor were untrue.

As the trial court pointed out, the prosecutor is an officer of the court with an obligation to be truthful. Olmsted has not presented anything to demonstrate that the prosecutor's statements were false or that the trial court abused its discretion in relying on the prosecutor's statements.

Olmsted argues that, without the additional, unsubstantiated evidence provided by the prosecutor, there were not adequate grounds to support the trial court's decision to grant the State's

motion to continue. As explained above, the trial court did not abuse its discretion by relying on the prosecutor's representations. Because the prosecutor represented that Yeager's recovery was ongoing and Yeager's doctor recommended delaying her participation in the trial for two to three weeks, there were adequate grounds to support the State's motion to continue. But even if we excluded the additional information presented by the prosecutor, the doctor's letter stating that Yeager had suffered an acute heart attack is sufficient grounds for granting a continuance on its own merits. Accordingly, Olmsted cannot show that the trial court abused its discretion by granting the State's motion to continue.

Olmsted also argues that the prosecutor committed reversible misconduct by making a motion to continue based on false representations to the trial court about Yeager's heart attack and medical condition. And he argues that he received ineffective assistance of counsel because his defense attorney did not challenge the State's evidence regarding Yeager's heart attack and did not present evidence that Yeager's heart attack was false. Here, because there is no evidence that substantiates Olmsted's claim that the prosecutor's statements were false, his claims of prosecutorial misconduct and ineffective assistance of counsel related to the motion to continue are meritless.

### III. PROSECUTORIAL MISCONDUCT

To prevail on a prosecutorial misconduct claim in a personal restraint petition, the petitioner "must prove the alleged misconduct was either a constitutional error that resulted in actual and substantial prejudice or a fundamental defect that resulted in a complete miscarriage of justice." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). In addition, because Olmsted did not object to the alleged misconduct during trial, his claims of prosecutorial

misconduct are waived unless the misconduct is "'so flagrant and ill-intentioned that it cause[d] an enduring and resulting prejudice that could not have been neutralized by a curative instruction.'" *In re Lui*, 188 Wn.2d at 539 (internal quotations omitted) (quoting *In re Pers. Restraint of Caldellis*, 187 Wn.2d 127, 143, 385 P.3d 135 (2016)).

It is misconduct for the prosecutor to misstate the law in closing argument. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). In addition, prosecutors may not rely on facts outside the evidence. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 705, 286 P.3d 673 (2012). When reviewing whether a prosecutor's statements are improper, we do not look at the alleged improper comment in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007).

A. SUBSTANTIAL BODILY HARM

Olmsted argues that the prosecutor misstated the law regarding substantial bodily harm by arguing that pain was sufficient to demonstrate that Yeager suffered substantial bodily harm. However, here, the prosecutor did not argue that pain was an element of the charge or that pain itself satisfied the element of substantial bodily harm. Instead, the prosecutor argued that the extent of pain accompanying Yeager's injuries corroborated the substantial nature of the injuries.

"'Substantial bodily harm' means bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b). The jury was properly instructed on the definition of substantial bodily harm.

Relying on the definition of substantial bodily harm, the prosecutor argued that the bruising to Yeager's face was a disfigurement and the injury to Yeager's jaw was an impairment of the

12

function of a body part. Then, the prosecutor argued that those injuries were substantial as evidenced, in part, by the extent and duration of pain accompanying those injuries. The prosecutor properly argued that the evidence presented at trial met the required elements of substantial bodily harm. When viewed in its entirety, the prosecutor's argument did not misstate the definition of substantial bodily harm. Accordingly, Olmsted's argument lacks merit.

B. MISREPRESENTATION OF FACTS

Olmsted argues that the prosecutor committed misconduct during closing argument because the prosecutor "cherry-picked" the evidence on which it would rely for its argument. Supp. Br. of Pet. at 22. However, Olmsted cannot provide any citation to authority that establishes it is misconduct for the State to focus specifically on the properly admitted evidence that best supports the State's argument. Therefore, Olmsted's claim that the State improperly "cherry-picked" the evidence to rely on in its closing argument lacks merit.

Also, Olmsted does not assert that the prosecutor made any inaccurate statements about Yeager's injuries. Rather, he argues that the prosecutor only made statements that were supported by Yeager's and Long's testimony, while ignoring contradictory testimony provided by Dr. Martin. Although it is improper for the prosecutor to misrepresent the evidence or testimony, it is not improper for the State to focus on the evidence or testimony that best supports its theory of the case. Therefore, Olmsted has failed to show that the prosecutor committed misconduct by primarily relying on Yeager's and Long's testimony in closing argument.

C. RELIANCE ON FACTS NOT IN EVIDENCE

Olmsted argues that the prosecutor committed misconduct during closing argument by relying on facts that were not in evidence when she told the jury that Olmsted said, "'I lost my

temper. I couldn't f[*****]g stop myself'" in a recorded jail phone call. PRP at 20-21. We hold that the prosecutor's statement was not improper.

Olmsted testified that he made phone calls to his father when Olmsted was in jail. And when the State cross-examined Olmsted at trial, the following exchange took place:

> [STATE]: Okay. Do you recall on February 2nd, 2013 a phone call at 16:37 saying -- your Dad saying, "I told you, don't hit her," and your response, "But I couldn't f[*****]g stop"?
>
> [OLMSTED]: I recall saying something of that nature, yes, because I was talking in regards of pain --

3 VRP at 425. During closing argument, the State said, "So in these recorded jail phone calls, these monitored jail phone calls, the Defendant re -- refutes himself on self-defense. He says it was an instantaneous reaction. 'I lost my temper. I couldn't f[*****]g stop myself. . . .'" 3 VRP at 555. Olmsted did not object.

Olmsted argues that the prosecutor's statement referred to facts that were not in evidence because the Olmsted did not make the alleged "But I couldn't f[*****]g stop" comment in the recorded jail phone call. 3 VRP at 425. However, Olmsted admitted to making these statements during his cross-examination. The prosecutor was simply offering a summary of Olmsted's testimony. Accordingly, the prosecutor's statement was not improper.

D. PERSONAL OPINION

Olmsted argues that the prosecutor committed misconduct during closing argument by repeatedly expressing her personal opinion regarding the evidence and the witnesses' credibility. Here, the prosecutor's statements were not flagrant and ill-intentioned, therefore, the prosecutor's alleged misconduct is not grounds for granting Olmsted's PRP.

14

Although a prosecutor has wide latitude to argue reasonable inferences from the evidence, a prosecutor "must 'seek convictions based only on probative evidence and sound reason.'" *In re Glasmann*, 175 Wn.2d at 704 (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)). A prosecutor "cannot use his or her position of power and prestige to sway the jury and may not express an individual opinion of the defendant's guilt, independent of the evidence actually in the case." *Glasmann*, 175 Wn.2d at 706. Reversal is not required if the error could have been obviated by a curative instruction which the defense did not request. *State v. Hoffman*, 116 Wn.2d 51, 93, 804 P.2d 577 (1999).

Here, even assuming that the prosecutor's comments were improper opinions, they were not flagrant and ill-intentioned. If Olmsted had objected to the prosecutor's use of "I" and "we" statements, the jury could have been instructed to disregard the statement and the prosecutor could have been instructed to prevent making any further "I" and "we" statements. Therefore, the claimed errors could have been cured and any further errors avoided. Accordingly, the prosecutor's statements during closing argument are not grounds for granting Olmsted's PRP.

E.  CLAIMS BASED ON CREDIBILITY DETERMINATIONS

Olmsted makes numerous other claims of prosecutorial misconduct during trial: (1) knowingly allowing Yeager to give false testimony, (2) knowingly allowing the officers to give false testimony, (3) vouching for Yeager's credibility by referencing her testimony during closing argument, and (4) misrepresenting the photographs that Yeager testified were taken 10-12 days after the assault. However, Olmsted's only argument substantiating any of these claims is Dr. Martin's testimony that she did not observe any obvious impairment to Yeager's jaw.

It is axiomatic that trial will involve inconsistent or even directly conflicting testimony. That is why credibility determinations and resolutions of conflicting testimony are left to the trier of fact. Here, the State presented testimony from several witnesses. Reconciling any inconsistencies in the testimony is the responsibility of the jury. Olmsted cannot demonstrate that any misconduct occurred simply because the prosecutor presented and relied on testimony that was inconsistent with another witness's testimony. Accordingly, these claims are meritless.

F. USE OF HAND SIGNALS

Olmsted also claims that the prosecutor committed misconduct by coaching witnesses with hand signals. Presumably, Olmsted is referring to the following exchange that occurred prior to Officer Long's testimony:

> (Jury is escorted into the courtroom.)
> (Defense Counsel and Defendant confer.)
> (Prosecutor presents Officer Long with glass of water.)
> [LONG]: Thanks. That's not (inaudible).
> [STATE]: I know.
> [LONG]: Okay. Thank you.
> [STATE]: But you might get a reading from those signals that -- I got halfway through.
> [LONG]: (Gestures.) And I don't know hand signals.
> [STATE]: We'll work on that later.
> [COURT]: Alright. Welcome back, ladies and gentlemen. I've resolved the legal issue as I've previously indicated that the basis for my ruling isn't something you need to concern yourself with. I'm applying the rules of evidence to the testimony that's being offered. So the objection was sustained. The next question, then?

2 VRP at 226-27. Nothing in this record substantiates Olmsted's claim that the prosecutor used hand signals to coach the witness or to influence her testimony. Accordingly, this claim is meritless.

Based on the context of the exchange, the prosecutor and the witness were referring to something related to the glass of water the prosecutor had just provided to Officer Long. Officer Long was not giving any substantive testimony and the prosecutor was not asking Officer Long any questions. Therefore, Olmsted cannot show that the prosecutor used hand signals to influence Officer Long's testimony.

G. CUMULATIVE ERROR

Olmsted argues that the cumulative effect of the prosecutor's misconduct deprived him of a fair trial. Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994). To be entitled to relief under the cumulative error doctrine, the petitioner must show multiple errors. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690-91, 327 P.3d 660 (2014). However, Olmsted has only identified one possible error—the prosecutor's "I think" and "we" statements during closing argument. Because there is only one possible error, the cumulative error doctrine does not apply.

IV. INEFFECTIVE ASSISTANCE OF COUNSEL

We apply the same standard of review to ineffective assistance of counsel claims brought in a personal restraint petition as we do on appeal. *In re Lui*, 188 Wn.2d at 538. To prevail on an ineffective assistance of counsel claim, a defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Our scrutiny of counsel's

performance is highly deferential; there is a strong presumption of reasonableness. *McFarland*, 127 Wn.2d at 335. To rebut this presumption, a defendant bears the burden of establishing the absence of any conceivable trial tactic explaining counsel's performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

To establish prejudice, a defendant must show a reasonable probability that the outcome of the trial would have differed absent the deficient performance. *McFarland*, 127 Wn.2d at 335. If a defendant fails to establish either deficient performance or prejudice, the ineffective assistance of counsel claim fails. *Strickland*, 466 U.S. at 697.

A. FAILURE TO OBJECT TO PROSECUTOR'S CLOSING ARGUMENT

Olmsted argues that he received ineffective assistance of counsel because counsel failed to object to the instances of prosecutorial misconduct he objects to above. However, the prosecutor's possibly improper "I think" and "we" statements were not prejudicial. As the prosecutor pointed out in argument, there was a significant amount of evidence to support the prosecutor's statement, therefore, there is not a reasonable probability that the jury was substantially affected by the addition of the prosecutor's opinion. Because Olmsted cannot show prejudice, his ineffective assistance of counsel claim based on the failure to object to the prosecutor's closing argument fails.

B. FAILURE TO MOVE TO ADMIT YEAGER'S PRIOR UNTRUTHFULNESS

Olmsted argues that he received ineffective assistance of counsel because counsel failed to present evidence of Yeager's untruthfulness including a prior false rape allegation Yeager made in the 1990's and Yeager's lies about her past drug use. However, Olmsted fails to support his assertions with competent, admissible evidence.

Olmsted asserts that Yeager made a false rape allegation based on a pretrial interview Yeager gave with Olmsted's investigator, Wayne Gunderson. However, this pre-trial interview is not competent, admissible evidence establishing that Yeager made a prior false rape allegation. *In re Rice*, 118 Wn.2d at 885-86.

Olmsted also argues that Yeager lied about her drug use. However, Olmsted does not identify any instance of Yeager lying about her past drug use in the record. Nor does Olmsted provide any competent, admissible evidence establishing that Yeager ever lied about her drug use. Accordingly, there are not instances which demonstrate Yeager lied about her drug use. Defense counsel was not deficient for failing to present evidence of Yeager's history of lying about her drug use.

Because counsel was not deficient for failing to present evidence of Yeager's alleged prior acts of untruthfulness, Olmsted's ineffective assistance of counsel claim on this ground fails.

C.  FAILURE TO EFFECTIVELY CROSS-EXAMINE WITNESSES

Olmsted also argues that he received ineffective assistance of counsel because counsel failed to effectively cross-examine Yeager, the police officers, and Dr. Martin.[4] The extent and method of cross-examination is generally a matter of trial strategy. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 720, 101 P.3d 1 (2004). After a review of the record, we see no deficiency in counsel's performance regarding cross-examination of Yeager, the police officers, or Dr. Martin.

---

[4] We also note that Olmsted has failed to identify any inconsistencies between Dr. Martin's testimony and her pretrial interview that Olmsted's counsel should have used to impeach or cross-examine Dr. Martin.

D.  FAILURE TO OBJECT TO PHOTOS OF YEAGER'S INJURIES

Olmsted argues that he received ineffective assistance of counsel because counsel failed to object to Yeager's testimony regarding the photos of her injuries after the incident. When an ineffective assistance of counsel claim is based on counsel's failure to object, the petitioner must show that the objection would likely have succeeded. *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

Olmsted argues that Yeager fabricated the timeline of when the photos were taken. However, Olmsted presents no credible evidence supporting his allegation that the photos were falsified or that they were not taken when Yeager said they were taken. Therefore, Olmsted has not shown that an objection would likely have been successful if counsel had objected to the photos. Accordingly, Olmsted cannot show deficient performance and his ineffective assistance of counsel claim fails.

E.  FAILURE TO MOVE TO SUPPRESS EVIDENCE AND PHOTOS TAKEN FROM THE HOME

Olmsted also argues that he received ineffective assistance of counsel because counsel failed to move to suppress the photos and evidence that were taken from his home following the incident. Specifically, Olmsted argues that Yeager had stated that she was planning on moving out of the house and not coming back. Therefore, Yeager could not consent to the police entering the house. He further argues that the State failed to prove that Yeager was living in the house.

When arguing ineffective assistance of counsel based on a failure to move to suppress evidence, the defendant must show that a motion to suppress likely would have been granted. *State v. Walters*, 162 Wn. App. 74, 81, 255 P.3d 835 (2011). Therefore, it is Olmsted's burden to show that the search was illegal and he fails to do that here.

Olmsted has not presented any evidence that shows Yeager was not living at the apartment at the time of the incident, nor does he present any evidence that establishes other grounds for suppressing the evidence the police collected from the home. Accordingly, Olmsted cannot establish ineffective assistance of counsel based on counsel's failure to move to suppress evidence.

F.  FAILURE TO OBJECT TO PROSECUTOR'S CROSS-EXAMINATION OF OLMSTED

Olmsted argues that he received ineffective assistance because counsel failed to object to the prosecutor's cross-examination of Olmsted—specifically, the prosecutor's questions regarding the statements Olmsted made to his father during the jail phone calls. Olmsted asserts that the statements were false and that defense counsel knew they were false based on the "Audio File List." PRP at 40. Olmsted appears to be referring to "Exhibit E" attached to his PRP. But Exhibit E does not contain transcripts or recordings demonstrating that the statements were false. Exhibit E is simply a summary of recorded jail calls. Accordingly, Olmsted has failed to meet his burden to demonstrate that the statements were false, and, therefore, counsel's performance was not deficient.

Olmsted does not identify any other basis on which the statements he made to his father during jail phone calls were objectionable. Therefore, Olmsted has failed to show that counsel's performance was deficient for failing to object to the prosecutor's cross-examination. Because Olmsted cannot show deficient performance, his ineffective assistance of counsel claim fails on this ground.

No. 48730-6-II

CONCLUSION

Olmsted has failed to meet his burden to show a constitutional error resulting in actual and substantial prejudice or a nonconstitutional error resulting in a fundamental miscarriage of justice. Accordingly, we deny his personal restraint petition.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

LEE, A.C.J.

WORSWICK, J.

22