IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 78256-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| KHAN, ZAHID AZIZ, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 12, 2019 |

SCHINDLER, J. — Zahid Aziz Khan filed a personal restraint petition (PRP) contending his attorney provided ineffective assistance of counsel by not obtaining an interpreter for trial on charges alleging multiple counts of child molestation and rape. The Washington Supreme Court ordered a reference hearing to determine whether Khan's constitutional or statutory rights were violated by the lack of an interpreter, and if so, whether actual and substantial prejudice entitled him to relief in his PRP. Following three days of testimony, the superior found that Khan was able to comprehend and understand the proceedings and was clearly understood by trial counsel. Although Khan "spoke in broken English and sometimes strained to find the right word or words to express himself," he "was nonetheless able to clearly express his defense." The superior court concluded Khan could not establish prejudice because there was no reasonable probability that the result of the trial would have been different if Khan had

an interpreter, and denied the PRP. Because substantial evidence supports the superior court's findings and the findings in turn support the conclusions of law, we affirm denial of the PRP.

FACTS

Zahid Aziz Khan was born in Pakistan in 1972 and is a native Urdu speaker. Khan moved to the United States in 1999 to marry Eram "Mona" Mirza. Mirza had a daughter, R.H., from a prior marriage. After marrying Khan, Mirza gave birth to a son and a daughter.

Mirza put the three children to bed the evening of July 16, 2007 at around 10:00 p.m. before leaving with her sister Sanober to visit family members down the street. Fourteen-year-old R.H. slept on a couch in a loft area and the two younger children slept nearby on mattresses on the floor. Khan was asleep in the master bedroom.

Mirza and Sanober both testified that after they returned sometime after midnight, they heard R.H. call out in a "shaky" voice, " 'Mom, mom, where are you?' " Mirza and Sanober heard Khan's voice coming from the loft area saying, " 'Shut up, shut up, what is your problem.' " When they climbed up to the loft area, both Mirza and Sanober saw Khan standing over R.H. with a full erection. R.H. was crying. R.H. told Mirza and Sanober that Khan had been molesting her "for a long time."

The State charged Khan in Snohomish County Superior Court with child molestation in the second degree, rape of a child in the second degree, rape of a child in the third degree, child molestation in the third degree, and attempted child molestation in the third degree of R.H.

2

R.H. testified that Khan had been molesting her since approximately 2004. R.H. testified she was in the fifth grade the first time Kahn molested her. The night before Valentine's Day during the fifth grade, R.H. told her mother she needed to bring cards to school. Khan offered to drive her to the store. On the way home in the car, Khan "grabbed" her breast and said, "[I]f you let me do this, then I'll get you things." R.H. said it "hurt" and she "felt really uncomfortable. . . . I was in shock." Khan told R.H. that if she told her mother what happened her mother would not believe her, and R.H. would be "sent away" to live in Pakistan. R.H. testified she did not tell her mom about the molestation because she "was scared."

R.H. testified that Khan frequently molested her while she was sleeping, either in her bedroom or in the loft area if she had fallen asleep while watching television. On one occasion, R.H. woke up to find Khan "squeeze[ing]" her breasts. Another time, R.H. was awakened by Khan moving his "finger . . . in and out" of her anus. R.H. testified, "I was scared out of my mind" and, "I cried." R.H. told a friend that Khan was molesting her but begged her friend not to tell anyone. R.H. said she did not tell her family because Khan threatened her or bought her gifts to keep her from doing so. Instead, R.H. said she begged her mother for a lock for her door. When Mirza did not get her a lock, R.H. asked for some bells that she could hang on her door so that she would wake up if Khan entered her room.

Mirza testified that Khan frequently woke up in the night to use the bathroom. Mirza said that instead of using the bathroom inside their master bedroom, Khan insisted on using the bathroom near R.H.'s room. When Mirza asked him not to do so, Khan argued, "This is my house, and I'll use any bathroom I want to." Mirza also

3

testified that R.H. asked "[m]any times" over the years for both a lock and the bells for her bedroom door.

Khan testified that Mirza and Sanober never left the house the night of July 16, 2007 and that he was in the loft area the entire time, not in the master bedroom. Khan testified that at one point he got up to cover his younger daughter with a blanket and give her a goodnight kiss. Khan said R.H. began yelling because she did not like him kissing his younger daughter and he told her, "[S]hut up, this is none of your business." Defense counsel asked Khan about the testimony of both Mirza and Sanober that he had an erection. Khan strenuously denied that he had an erection:

> Q. Did you have an erection when you were upstairs with the children in the loft?
> A. No. She is my daughter. I don't even think this way.

On cross-examination, the prosecutor also asked Khan whether he had an erection while in the loft on July 16, 2007.

> Q. So what about all this caused you to get the erection?
> A. What do you mean, erection?
> Q. I mean, what caused your penis to get aroused?
> A. When I heard this thing, I'm thinking, how they is using this word? I can[n]ot say anything in front of my sister or anything, this kind of word. How they using openly, in front of everybody, and they don't feel one thing, this is how shameful word. I not imagine.
> Q. So they should be too ashamed to say that?
> A. No, ashamed to say I can do this thing, this kind of thing, this kind of feeling, like I have something like that.
> Q. You don't ever get erections?
> A. No. No.

The prosecutor later returned to the issue of the erection:

> Q. I believe you testified earlier that you — we were talking about the erection, and you said you wished you had a camera to show what had happened; is that right?
> A. No, no, no. I said, you know, like, video camera, I can make my own — all you guys saying erection; right?

4

Q. Uh-huh.
A. I say, I wish I can also made — I can made video my own, what kind of I have my — like, how what I'm wearing, what I had kind of I have pant, what kind of I have shirt. I mean that.
Q. So you want to show what, now, that you didn't have an erection?
A. I don't have erection.
Q. Ever?
A. Never. Ever. Look at this, this is my family. Okay, front of my kids, what I'm showing this kind of thing? I am respectable person.

On redirect, defense counsel asked Khan to clarify what he meant when he said that he "[n]ever" had an erection.

Q. So when you covered [the younger daughter] up, did you have an erection?
A. She's my blood, sir. Don't even think about it. She's my blood.
Q. But [R.H.] is not your blood?
A. I treat her more — like, same, like [the younger daughter].
Q. So you didn't have an erection because of [R.H.]?
A. No.
Q. Did you have an erection at all?
A. Not at all.
Q. Have you ever walked around the house with an erection?
A. Sir, I'm the man of the home. I want to respect them. I want to give them example like that, I'm this kind of person, how they going to grow up? What they going to think about me, what kind of our dad?
Q. You mentioned to the prosecutor — or she asked you, Do you ever have erections; and you said no.
A. No.
Q. Now, do you mean ever, ever, or just —
A. In front of my wife. I live with my wife. I have erection because when I sleep with her, without erection I cannot do my — make my kids.
Q. But what did you mean, that you don't have an erection?
A. I mean not front of kids. I just stay inside my home, inside the room, whenever I do, inside my room.

In closing argument, defense counsel challenged R.H.'s credibility, arguing that R.H. waited four years to report the molestation and that she had a motive to lie because she did not like following Khan's rules. Defense counsel argued Khan's testimony was more credible.

5

In rebuttal argument, the prosecutor argued Khan's testimony about the erection was not credible:

> Mr. Khan, the defendant, testified or [defense counsel] Mr. Nahajski said that when he testified, his reaction to the accusation that he had an erection was natural and credible. I want to tell you again, any credibility determination is yours; not mine, not Mr. Nahajski's. But you will remember what he said: This is ridiculous; I don't get erections. That's what he said the first time. Later he said — and I asked him again, You don't get erections? No, I don't get erections.
>
> That wasn't natural or credible. He was trying to say whatever he can to make himself look better. Later he said, Well, I did have the children, so in the bedroom. But apparently his erections are limited to that place. I would submit to you that that is not credible.

A jury convicted Khan as charged. We affirmed the jury convictions. State v. Khan, 149 Wn. App. 1052, 2009 WL 1058626.[1]

Khan filed a personal restraint petition, arguing his defense attorney was ineffective for failing to obtain an interpreter for trial. In support of his petition, Khan attached his own declaration in which he stated that he had only a middle school education and understood limited English. According to Khan, he told his attorney that he "did not speak English very well" and that he "would probably not understand everything that was said in court." Khan said the attorney reassured him that everything would be fine and that "using an interpreter would make me look bad." Khan stated that he was "confused" when he testified and that "there were a number of times when I did not understand exactly what was asked or how to accurately express myself in English." We dismissed the petition.

---

[1] In his direct appeal, Khan argued that the prosecutor committed misconduct by expressing a personal belief in his guilt, his attorney was ineffective for failing to object to testimony regarding the negative social consequences R.H. experienced as a result of testifying, and the court erred in admitting a photograph of his younger daughter.

The Washington Supreme Court granted review. The court concluded that based on the existing record, Khan had not "established prejudice sufficient to justify vacating his conviction." In re Pers. Restraint of Khan, 184 Wn.2d 679, 692, 363 P.3d 577 (2015). However, the court states the line of questioning involving the erection "strongly suggests [Khan] had only limited ability to either understand the questions or meaningfully respond to them." Khan, 184 Wn.2d at 692. The court ordered the superior court to conduct a reference hearing to determine whether "Khan's language skills were such that he was entitled to the assistance of an interpreter" and if so, "whether there is a reasonable probability that but for counsel's errors, the result of the trial would have been different." Khan, 184 Wn. 2d at 692-93.

On remand, a Skagit County Superior Court judge presided over the reference hearing. Over the course of the three-day evidentiary hearing, the superior court reviewed 15 exhibits and heard testimony from eight witnesses. Khan called three witnesses to testify— teacher Kelly Anderson, attorney Jay Stansell, and linguist Dr. Robert Leonard. An Urdu interpreter assisted Khan throughout the hearing. Khan did not testify at the hearing.

Kelly Anderson is an adult basic education teacher who was Khan's GED[2] instructor in prison. Anderson testified that when Khan entered prison, his written English vocabulary and comprehension were at a fifth grade level. But Anderson acknowledged that speaking and listening in English are "generally easier than reading or [w]riting" and "[t]here was no test given to test his ability to communicate verbally in the English language."

---

[2] General education development.

7

Jay Stansell is an experienced public defender in state and federal court with particular expertise working with clients whose native language is not English. Stansell had never met or spoken to Khan. However, Stansell testified that based on the transcript of the trial, Khan was prejudiced by the lack of an interpreter because Khan was attempting "to explain complicated things about his movements on that night" and "his relationship with the alleged victim"; and "over, and over, and over again his answers are either confused, or contradictory, or incomprehensible." Stansell identified "50 to 100" instances at trial in which Khan's inability to understand or meaningfully answer questions made him seem "evasive," and estimated that 30 percent of Khan's testimony was "incomprehensible" to the jury. Stansell concluded that a jury would not see Khan as credible under such circumstances. Nonetheless, Stansell acknowledged that a person in court "listening to Mr. Khan testify would have a better ability to assess his English fluency than a person reading a transcript of that proceeding." Stansell also admitted that he had not read the transcript of the testimony from the other witnesses and did not compare Khan's fluency and comprehension to those of the other witnesses who did not speak English as a first language.

Dr. Robert Leonard is a linguistics professor at Hofstra University. Dr. Leonard had not met with or spoken to Khan. Based on a review of the transcript of Khan's testimony, Dr. Leonard concluded that Khan had only limited working proficiency in English. Dr. Leonard identified a large number of grammatical errors in Khan's testimony. But he conceded many of these were trivial, including improper "word order" or the absence of an indefinite article such as "a" or "the."

The State called five witnesses to testify— jail classification counselor Terry Bloss, former Snohomish County Deputy Prosecutor Cynthia Larsen, Khan's trial attorney Lennard Nahajski, Snohomish County Superior Court Judge Kenneth Cowsert, and Snohomish County Sherriff Detective Steven Martin.

Terry Bloss conducted the intake interview with Khan at the Snohomish County Jail. Bloss asked Khan a standard set of questions, including questions about disciplinary problems at prior institutions, whether he needed to be placed in protective custody, potential gang affiliation, and medical history. Bloss testified Khan "was able to answer each and every question" she asked him, she was able to understand him, and he told her that he understood her questions and "the inmate handbook."

Deputy Prosecutor Cynthia Larsen[3] testified that Khan spoke with an accent and imperfect English, as did other witnesses, including Mirza and Sanober. However, Larsen did not have "any difficulty" understanding what Khan was saying during his testimony. Larsen said there was nothing in his manner or facial expressions that made her believe Khan was not understanding the proceedings. Larsen testified that if she had any concern that Khan needed an interpreter, she would have raised the issue and that she did not do so.

Lennard Nahajski has practiced in the field of criminal defense since 1992. Nahajski testified that he met with Khan in jail at least 5 times and had at least 18 telephone conversations with him before trial. Nahajski discussed prospective witnesses with Khan and extensively prepared Khan for his own testimony. Nahajski also had a lengthy discussion with Khan about whether to seek a continuance of the

---

[3] At the time of the reference hearing, Larsen was a Snohomish County Superior Court judge.

trial date to subpoena records from R.H.'s Myspace[4] account, and Khan agreed that he should. Nahajski testified that he has represented "many" clients for whom English is not their first language and that "it's readily apparent" to him when a client needs an interpreter. Nahajski testified that Khan never requested an interpreter, that he did not need to use an interpreter to understand Khan's English, and that Khan did not express or exhibit any apparent inability to speak or understand English. Nahajski testified that "based on his interactions with me it appeared to me that he was understanding 100 percent." Nahajski denied that he ever told Khan that an interpreter would "make him look bad."

Snohomish County Superior Court Judge Kenneth Cowsert presided over Khan's trial. Judge Cowsert testified he did not have any difficulty understanding Khan and it appeared Khan understood the allegations against him and was adequately able to communicate. Judge Cowsert testified that as a judicial officer, it was his responsibility to intervene and obtain an interpreter for a defendant who could not understand the proceedings, "whether or not the parties appearing in front of [him] had raised that same concern."

Detective Steven Martin was the detective who investigated the alleged crimes against R.H. and advised Khan of his rights during an interview. Detective Martin testified that he gave Khan an explanation of rights form and that he read the form aloud to Khan and "asked for him to read along with me." Detective Martin testified that Khan acknowledged that he understand his rights verbally and signed the form. Detective Martin testified that after Khan told him that he understood his rights, Khan requested to

---

[4] Myspace is a social networking website.

speak to an attorney and Detective Martin terminated the interview. The court admitted the explanation of rights form signed by Khan into evidence. During the examination of Detective Martin, the prosecutor played the audio recording of Martin's interview with Khan.

Detective Martin also attended the trial. Detective Martin testified that he sat at counsel's table and observed Khan throughout the trial. Detective Martin testified that he did not have any difficulty understanding Khan and that Khan appeared to be comprehensively responding to the questions asked him at trial.

The superior court issued a letter ruling. The superior court first addressed whether Khan's constitutional or statutory right to an interpreter was violated. The court concluded his constitutional right to an interpreter was not violated because Khan "was capable of making himself understood," "seemed to readily comprehend questions put to him," and "was able to clearly express his defense." By contrast, the court notes that the statutory right to an interpreter is "more extensive than the constitutional" right. The court ruled that chapter 2.43 RCW guaranteed the right to an interpreter for non-English speakers, and that a non-English speaking person is any person involved in a legal proceeding who cannot "readily" speak or understand the English language. RCW 2.43.020(4). The superior court concluded that Khan's statutory right to an interpreter was violated. Although Khan "was able to make himself understood and present his defense, that ability does not equate to being readily able to speak the English language."[5]

---

[5] Emphasis added.

11

The court then turned to whether Khan was prejudiced by the lack of an interpreter. The court states Khan "has not identified a single instance where he would [have] done anything differently had there been an interpreter." The court concluded that Khan was not prejudiced because he could not show "a reasonable probability that but for counsel's errors, the result of the trial would have been different."

The superior court entered findings of fact and conclusions of law consistent with the letter ruling. The findings of fact and conclusions of law state:

A.     FINDINGS OF FACT
1. Prior to and during trial, the defendant was readily able to understand and be understood by his trial counsel.
2. During trial, the defendant was able to readily comprehend the questions that were asked of him and make himself understood while testifying.
3. During trial, the defendant spoke in broken English and sometimes strained to find the right word or words to express himself. He was nonetheless able to clearly express his defense.
4. The defendant has not established that he would have done anything differently at trial if an interpreter had been provided.
5. There is no reasonable probability that the result of the trial would have been different if the defendant had been provided an interpreter. This court's confidence in the outcome has not been undermined.

B.     CONCLUSIONS OF LAW
1. A defendant has a constitutional right to an interpreter if he is incapable of comprehending questions or of making himself understood In English. Since the defendant in this case was capable of doing those things, his constitutional right to an interpreter was not violated.
2. Under RCW 2.43.010, a defendant has a statutory right to an interpreter if he cannot readily understand or communicate in the English language due to a non-English-speaking cultural background. "Readily" means "in a ready manner" or "without much difficulty." Since the defendant spoke in broken English and sometimes strained to find the right word or words to express himself, he had a statutory right to an interpreter.
3. To establish prejudice from the lack of an interpreter, the defendant must establish a reasonable probability that the outcome of the trial [would] have been different if an interpreter

12

was provided. Since no such probability exists, the defendant has failed to establish prejudice.

The superior court denied Khan's personal restraint petition. Khan appeals.

ANALYSIS

The sole issue on appeal is whether the superior court erred in finding Khan was not prejudiced by the lack of an interpreter for his trial. We conclude substantial evidence supports the superior court findings.

To be entitled to relief by way of a personal restraint petition, a petitioner must establish either constitutional error that caused actual and substantial prejudice or a nonconstitutional error that constitutes a fundamental defect that results in a complete miscarriage of justice. In re Pers. Restraint of Davis, 152 Wn.2d 647, 671-72, 101 P.3d 1 (2004). A petitioner who makes a successful ineffective assistance of counsel claim has necessarily met his burden to show actual and substantial prejudice. State v. Buckman, 190 Wn.2d 51, 63, 409 P.3d 193 (2018) (citing In re Pers. Restraint of Crace, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012)).

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel to help ensure a fair trial. State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To prevail on an ineffective assistance of counsel claim, a defendant must show both deficient performance and resulting prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish prejudice, a defendant must show there is a reasonable probability that the result of the trial would have been different but for counsel's deficient performance. Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." Strickland, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

Ineffective assistance of counsel claims present mixed questions of law and fact. State v. Lopez, 190 Wn.2d 104, 116, 410 P.3d 1117 (2018). We review a trial court's factual findings made in the course of deciding an ineffective assistance issue for substantial evidence. Lopez, 190 Wn.2d at 116. We review the legal conclusions flowing from the factual findings and testimony de novo. Lopez, 190 Wn.2d at 116-17. Substantial evidence is "defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Unchallenged findings of fact are verities on appeal. State v. Gaines, 154 Wn.2d 711, 716, 116 P.3d 993 (2005).

Khan challenges finding of fact 5 that states, "There is no reasonable probability that the result of the trial would have been different if the defendant had been provided an interpreter." Khan contends that the evidence at the reference hearing shows "[i]t is reasonably probable that the jury's assessment of Khan's credibility at trial rested in significant part on the language barrier" and "[t]hat fact alone undermines confidence in the outcome and requires reversal." We disagree.

First, finding of fact 3 states that Khan "spoke in broken English and sometimes strained to find the right word or words to express himself" but "was nonetheless able to clearly express his defense." Khan does not challenge this finding and it is therefore a

14

verity on appeal. Second, substantial evidence supports the finding that Khan did not show prejudice. None of Khan's witnesses at the reference hearing, with the exception of one,[6] had ever met or spoken with him. Attorney Stansell and linguistics professor Dr. Leonard based their opinion of Khan's communication abilities entirely on the written record of the trial. But there are a host of factors that are impossible to capture in a transcript, such as facial expressions, gestures, demeanor, body language, and tone of voice. In contrast, Khan's defense counsel, the prosecutor, and the trial judge witnessed Khan testify and spent significant time interacting with Khan in person. And all three agreed that Khan was able to understand the questions put to him and communicate his defense to the jury. The superior court found their testimony more relevant and credible than that of Stansell and Dr. Leonard. We defer to the trier of fact to weigh conflicting testimony and the credibility of witnesses, and accordingly we do not disturb its findings on appeal.

Khan compares this case to State v. Aljaffar, 198 Wn. App. 75, 392 P.3d 1070, review denied, 188 Wn.2d 1021, 398 P.3d 1143 (2017). But Aljaffar supports the superior court's finding that Khan did not show prejudice. In Aljaffar, defense counsel advised the court of the need for an Arabic interpreter, but the trial court appointed an uncertified interpreter without the requisite finding of good cause. Aljaffar, 198 Wn. App. at 78-79. At a reference hearing, a certified Arabic interpreter found multiple discrepancies between the English spoken at trial and the Arabic interpretation, as well as instances where no interpretation was provided at all. Aljaffar, 198 Wn. App. at 81. We noted that an inadequate English interpretation of the defendant's testimony "could

---

[6] GED instructor Anderson.

have detracted from the jury's ability to assess [the defendant]'s credibility." Aljaffar, 198 Wn. App. at 86. However, we concluded that the evidence presented at the reference hearing established the defendant was not prejudiced because he "was able to relay his version of the incident to the jury" during the trial. Aljaffar, 198 Wn. App. at 87.

Likewise, here, Khan does not show prejudice. It was clear from the testimony that Khan understood what an erection was. Defense counsel was the first to raise the issue, asking if Khan had an erection while in the loft area. Khan said, "She is my daughter. I don't even think this way." Though Khan answered "[n]ever" when the prosecutor asked if he had ever had an erection, Khan immediately clarified that he meant he had never had an erection in front of his children by stating, "Look at this, this is my family. Okay, front of my kids, what I'm showing this kind of thing? I am respectable person." Further, on redirect, Khan testified, "I mean not front of kids. . . . [W]henever I do, inside my room." None of the other grammar or word choice errors identified by Dr. Leonard had any impact on the jury's ability to understand Khan. Khan has not shown a substantial possibility that had he been provided an interpreter, the jury would have acquitted him of the charges.

Khan challenges finding of fact 4 that states, "The defendant has not established that he would have done anything differently at trial if an interpreter had been provided." Khan argues that Strickland requires finding only a reasonable probability of a different outcome, not that the defendant or defense counsel would have acted differently. The findings of fact show the court used the Strickland standard for prejudice. See Strickland, 466 U.S. at 694. First, as noted, finding of fact 5 states, "There is no

16

reasonable probability that the result of the trial would have been different if the defendant had been provided an interpreter. This court's confidence in the outcome has not been undermined." Second, the language the court used in finding of fact 4 mirrors the language the Washington Supreme Court used in explaining the remand for a reference hearing:

> Khan has not established prejudice sufficient to justify vacating his conviction. He simply has not shown that, even assuming counsel was deficient in failing to secure an interpreter, " 'there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different.' " In re Pers. Restraint of Brett, 142 Wn.2d [868,] 873[, 16 P.3d 601 (2001)] (quoting [State v. ]Hendrickson, 129 Wn.2d [61,] 78[, 917 P.2d 563 (1996)]). This is likely in part a consequence of the high level of abstraction with which Khan is approaching this issue, rather than drilling down into how the lack of an interpreter caused him prejudice by demonstrating what specifically he would have done differently had he understood the proceedings or questions. While we understand that he believes this is structural error, he would have been well advised to present sufficient evidence and argument of prejudice in the alternative. See In re Pers. Restraint of Coats, 173 Wn.2d [123,] 132[, 267 P.3d 324 (2011)] (citing In re Pers. Restraint of Elmore, 162 Wn.2d 236, 251, 172 P.3d 335 (2007)); In re Pers. Restraint of Rice, 118 Wn.2d [876,] 886[, 828 P.2d 1086 (1992)].

Khan, 184 Wn.2d at 692.[7] We do not find any error with regard to finding of fact 4.

Khan challenges findings of fact 1 and 2. Finding of fact 1 provides, "Prior to and during trial, the defendant was readily able to understand and be understood by his trial counsel." Finding of fact 2 provides, "During trial, the defendant was able to readily comprehend the questions that were asked of him and make himself understood while testifying." Khan contends that these findings "appear to involve a scrivener's error"

---

[7] Emphasis added.

because the findings are inconsistent with conclusion of law 2 that states:

> Under RCW 2.43.010,[8] a defendant has a statutory right to an interpreter if he cannot readily understand or communicate in the English language due to a non-English-speaking cultural background. "Readily" means "in a ready manner" or "without much difficulty." Since the defendant spoke in broken English and sometimes strained to find the right word or words to express himself, he had a statutory right to an interpreter.

We agree that there appears to be an ambiguity between use of the word "readily" in the findings of fact and use of the word "readily" in the conclusion of law. But the letter ruling clarifies the inconsistency. In the letter ruling, the court states that while Khan was able to "readily" understand English, he was not able to "readily" speak English:

> While the record and witness testimony reflects that Mr. Khan was able to readily understand English, he spoke in broken English and sometimes strained to find the right word or words to express himself. The testimony of both Dr. Leonard and Ms. Anderson place Defendant's English speaking proficiency at a grade school level. While Defendant was able to make himself understood and present his defense, that ability does not equate to being readily able to speak the English language.

A superior court's letter ruling may be considered for the purpose of interpreting its findings of fact and conclusions of law. State v. Wilks, 70 Wn.2d 626, 629, 424 P.2d 663 (1967). In context, the superior court found that Khan was able to "readily" understand the proceedings and the questions asked, that Khan was able to communicate and present his defense, and that he was not "readily" able to speak English. The findings are not inconsistent with the conclusion that the lack of an

---

[8] RCW 2.43.010 provides, in relevant part:

It is hereby declared to be the policy of this state to secure the rights, constitutional or otherwise, of persons who, because of a non-English-speaking cultural background, are unable to readily understand or communicate in the English language, and who consequently cannot be fully protected in legal proceedings unless qualified interpreters are available to assist them.

interpreter did not violate his constitutional rights but was a violation of his statutory right to an interpreter.

We affirm the superior court order denying the personal restraint petition.

_Schindler, J._

WE CONCUR:

_Andrus, J._                _Appelwick, CJ_